[No. A119918. First Dist., Div. Three. Dec. 31, 2009.]

TOWN OF TIBURON et al., Plaintiffs, Cross-defendants and Respondents,
v.
JIMMIE D. BONANDER et al., Defendants, Cross-complainants and Appellants.

## COUNSEL

Frank Mulberg and Brett D. Mulberg for Defendants, Cross-complainants and Appellants.

McDonough Holland & Allen, Thomas R. Curry, Andrea S. Visveshwara; and Ann R. Danforth, Town Attorney, for Plaintiffs, Cross-defendants and Respondents.

## OPINION

**McGUINESS, P. J.**—The Town of Tiburon (the Town) formed a special assessment district for the purpose of placing overhead utility lines underground within the district. When original estimates of the project's cost proved to be too low, the Town sought to impose a supplemental assessment to cover the increased costs. After the Town filed an action to validate the supplemental assessment, a group of affected property owners (appellants) filed a cross-complaint challenging the supplemental assessment on a variety of grounds. On appeal from a judgment in favor of the Town, appellants argue the trial court erred in denying their petition for writ of mandate seeking to invalidate the supplemental assessment.

After conducting an independent review of the record, we conclude the supplemental assessment fails to satisfy the proportionality requirement imposed by article XIII D of the California Constitution (article XIII D), which mandates that no assessment shall exceed the reasonable cost of the proportional special benefit conferred on a parcel. (Art. XIII D, § 4, subd. (a).) Accordingly, we reverse the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Appellants own real property located within the boundaries of the Del Mar Valley Utility Undergrounding Assessment District (Original District) and the Del Mar Valley Utility Undergrounding Supplemental Assessment District (Supplemental District). The Original District and the Supplemental District share the same boundaries and include the same parcels. Both districts employ the same approach for assigning special benefits and apportioning costs among the parcels within the district. Thus, although this appeal concerns the Supplemental District, we consider the events giving rise to the Original District in order to give context to our consideration of the Supplemental District.

In May 2003, two property owners who live in a neighborhood of the Town commonly referred to as the Del Mar Valley area presented a petition of 116 homeowners to the Town to urge the creation of the Original District in order to finance the replacement of overhead utility wires with underground lines carrying electricity, telephone signals, and cable services. The property owners who signed the petition represented approximately 62 percent of the 187 homes in the proposed district. The petition satisfied the requirements of the Town's policy and procedures for the formation of utility undergrounding assessment districts in that it reflected the support of at least 60 percent of all the parcels in the proposed district. As indicated in the petition, it was understood that each owner would pay the assessment based upon "an equal payment," and it was estimated the project would cost $16,000 to $20,000 per parcel, exclusive of incidental costs, in addition to costs of $650 to $3,000 per parcel to cover the cost of undergrounding the lateral connection from the street to a residence.

After receiving the property owners' petition, the Town's council adopted a resolution of intention in June 2003 to form the Original District pursuant to the Municipal Improvement Act of 1913 (Sts. & Hy. Code, § 10000 et seq.). In July 2003, the Town approved expanding the Original District to include 18 parcels in a "special zone" referred to as the "West Hawthorne Drive Area." Although several properties in the West Hawthorne Drive Area border properties in the Original District as initially proposed, the administrative record reflects that the special zone receives its electrical utilities from a different grid than the rest of the Original District. The Town received petitions from 11 of the 18 parcel owners in the West Hawthorne Drive Area (or approximately 61 percent) favoring inclusion in the Original District.

The Original District is located on the Tiburon Peninsula, which extends into San Francisco Bay in Marin County. The boundaries of the district extend from Tiburon Boulevard, which runs along or near the bay, up to Hacienda Drive, which is roughly parallel to Tiburon Boulevard. Parcels within the district's boundaries near Tiburon Boulevard are generally smaller than parcels located closer to Hacienda Drive. A public school in the district occupies 10 parcels near Tiburon Boulevard. As reflected by comments in the public record, some of the parcels in the Original District are hillside properties with bay views, whereas some of the parcels, such as those closer to Tiburon Boulevard and the school, are generally situated at a lower elevation and lack bay views. Some properties in the Del Mar Valley have views toward Sausalito and the Golden Gate Bridge.

The Town engaged a civil engineer, designated the "engineer of work," to prepare a report analyzing the proposed project. On March 10, 2005, the engineer of work submitted a preliminary engineer's report, which the

Town's council approved on March 16, 2005. The report explained that the utilities to be placed underground provided direct service to the properties within the Original District. The report stated that the proposed underground utility facilities would confer a special benefit on the 221 parcels located in the proposed district as a result of aesthetic, service reliability, and safety benefits associated with the improvements. The engineer of work opined that the general benefits, if any, enjoyed by the surrounding community and the public in general as a result of the undergrounding of the local overhead utilities within the Original District were intangible and therefore not quantifiable. Therefore, the engineer of work concluded that 100 percent of the proposed improvements were of direct and special benefit to the properties located within the Original District.

In determining the special benefit conferred on each parcel within the Original District, the engineer of work assigned each parcel "benefit points" based on three categories: (1) aesthetic benefit from removal of unsightly poles and overhead wires, (2) improved safety because of the reduced risk of downed poles and wires, and (3) greater service reliability attributable to new wiring and equipment as well as the reduced risk of downed power lines. The engineer of work assigned benefit points according to the highest and best use of each property.[1] Thus, a vacant property would be treated as if it were developed to its highest potential and connected to the system.

The engineer of work assigned one benefit point for aesthetics to each parcel that is adjacent to existing overhead utility lines, irrespective of the particular view the property enjoys. Likewise, with respect to the safety benefit, each parcel adjacent to existing overhead utility lines received one benefit point. By contrast, the reliability benefit was dependent upon the nature of the property's use, with parcels containing a single-family residence (designated "single family residential") assigned one benefit point for service reliability. Parcels other than those designated single family residential, such as parcels containing multiple dwellings and those on which the school is situated, were assigned benefit points for service reliability according to a formula contingent upon relative peak energy use. Therefore, a parcel containing a single-family residence could receive a total of three benefit points—one for aesthetics, one for safety, and one for reliability.

Because almost all of the parcels within the Original District are considered single family residential, almost all of the parcels were assigned exactly three benefit points. Of the 221 parcels in the Original District, all but 23, or a total of 198, received three benefit points. Two parcels containing multiple

---

[1] Certain parcels with no potential for development were considered exempt from the assessment, such as parcels too small to be developed or those designated as open space.

dwelling units received 3.4 benefit points each, and the 10 parcels on which the school is situated received a total of 17.3 benefit points.

The remaining 11 parcels are in areas that had previously placed their overhead utilities underground. These 11 parcels are located in two different areas, with seven of the parcels located on Noche Vista Lane, a private drive, and four of the parcels on Geldert Court, a cul-de-sac extending off of Geldert Drive. Nine of the 11 properties have no frontage along roadways with poles and overhead wires. These properties received no benefit points for aesthetics. However, with respect to two of the properties determined to have frontage along roadways with poles and overhead wires, the engineer of work assigned one-half of an aesthetic benefit point to each parcel, even though the parcels already received their utilities from an underground network. The report assigned one-half of a safety benefit point and one-half of a reliability benefit point to each of the 11 properties in the previously undergrounded areas. The engineer of work reasoned that "[t]hese properties are considered to receive half the benefit from service reliability, as their small systems are completely surrounded by and dependent on the larger overall system that is to be undergrounded, and half the benefit from improved safety, as ingress and egress from their property is directly affected by overhead lines and poles." Accordingly, of the 11 parcels in previously undergrounded areas, nine received one total benefit point each and two received 1.5 total benefit points each.

The Original District was split into three "zones of benefit" described as the Del Mar Valley Area, the West Hawthorne Drive Area, and the Hacienda Drive Area. The engineer of work calculated the construction costs separately for each of these zones. The West Hawthorne Drive Area consists of the 18 parcels that had petitioned to be included in the Original District but that receive their utilities from a separate system of overhead utility lines. The Del Mar Valley Area comprises the largest zone within the Original District, consisting of 164 parcels. The Hacienda Drive Area consists of 39 parcels on or near Hacienda Drive, on the northeastern border of the Original District. Although the engineer of work's report does not state why the Hacienda Drive Area was created as a separate zone for purposes of calculating construction costs, elsewhere in the administrative record it is explained that the area contains lower density development (i.e., larger parcels), thus making it more costly per parcel to place utilities underground.

Total costs for the assessment were estimated to be $4.72 million, of which $3,900,611 were construction costs. Construction costs in each of the three benefit zones were calculated separately and apportioned to properties within

that zone in proportion to the number of benefit points assigned to each property. The remaining project costs, including incidental expenses and financial costs, were allocated to each zone in the same proportion as construction costs among the zones. As a consequence, a parcel in a zone with a higher construction cost per parcel would also have a correspondingly higher allocated cost for incidental expenses and financial costs.

Because the engineer of work determined construction costs separately for each of the three benefit zones, a parcel assigned three benefit points in one zone had a different proposed assessment than a parcel assigned the same number of benefit points in another zone. Thus, the proposed assessment for a single family residential parcel receiving three benefit points was $12,528.19 in the West Hawthorne Drive Area, $21,717.04 in the Del Mar Valley Area, and $31,146.62 in the Hacienda Drive Area. Proposed assessments for the 11 parcels in areas with utilities already placed underground ranged from $7,239.02 to $15,573.51.

Owners of parcels in the Original District voted in favor of the assessment. The vote was 71 percent in favor and 29 percent opposed, with individual parcel votes weighted according to each parcel's proposed assessment. On May 18, 2005, the Town's council voted unanimously to approve the engineer of work's final report, to order the improvements, to establish the Original District, and to confirm the proposed individual assessments. On May 27, 2005, assessment notices were sent to property owners within the Original District.

Two couples who had previously objected to inclusion of their parcels in the Original District filed suit in June 2005 against the Town and its council. (See *Bonander v. Town of Tiburon* (2009) 46 Cal.4th 646, 650 [94 Cal.Rptr.3d 403, 208 P.3d 146].) That lawsuit, which remains pending, is not the subject of this appeal.[2]

---

[2] The plaintiff property owners sought to invalidate the resolution establishing the Original District on a number of grounds, including that the assessment violated article XIII D. (*Bonander v. Town of Tiburon, supra*, 46 Cal.4th at p. 650.) The trial court dismissed the complaint on procedural grounds, concluding that the plaintiffs had failed to comply with requirements applicable to validation actions (Code Civ. Proc., § 860 et seq.). (*Bonander v. Town of Tiburon, supra*, at p. 652.) After this court affirmed the dismissal, the Supreme Court accepted review of the matter. (*Ibid.*) The Supreme Court ultimately held that a property owner who contests an individual assessment levied under the Municipal Improvement Act of 1913 is not required to comply with procedural requirements applicable to validation actions. (*Bonander v. Town of Tiburon, supra*, at p. 659.) Accordingly, the trial court's judgment of dismissal was reversed and the plaintiffs were allowed to proceed with their challenge to the Original District. The record before this court does not disclose whether the trial court in that action has ruled on the challenge to the Original District or, if so, how the court ruled.

In January 2006, while the legal challenge to the Original District was on appeal, property owners in the Original District received notice that projected construction costs were significantly higher than previously estimated. Construction costs had risen significantly since the summer of 2005, with the price of asphalt alone increasing 73 percent from July to October 2005. The engineer of work estimated that actual construction costs would exceed previous cost estimates by over $2 million.

At a meeting held on February 1, 2006, the Town's council considered a number of options in response to the increased cost estimates, including cancelling the project or pursuing the process for implementing a supplemental assessment to cover the increased costs. The Town's council chose to pursue the supplemental assessment process to allow affected property owners to determine for themselves whether to continue the project. Accordingly, the Town's council adopted a resolution of intention at the February 2006 meeting to form the Supplemental District pursuant to the Municipal Improvement Act of 1913.[3] The Town's resolution of intention indicated that the Supplemental District was to be established pursuant to section 10426 of the Streets and Highways Code.[4] The Town directed the engineer of work to prepare a supplemental engineer's report.

At a meeting held March 20, 2006, the Town's council considered a preliminary report for the Supplemental District prepared by the engineer of work. The engineer of work estimated that the net construction costs to be funded by the Supplemental District were $2,860,488, which represented the amount by which revised construction costs for the project exceeded construction funds available from the Original District assessment. Overall, taking into account incidental expenses and financing costs, there was a shortfall of $3.18 million that would have to be covered by a supplemental assessment.

The engineer's report for the Supplemental District employed the same method of assessment as the Original District. The Supplemental District included the same 221 parcels as the Original District. The special benefit

---

[3] The Town adopted the resolution of intention without requiring petitions of support from at least 60 percent of the parcels in the proposed Supplemental District. The Town reasons that the 70 percent favorable vote on the Original District obviated the need for a separate petition to demonstrate support among property owners for pursuing the project.

[4] Streets and Highways Code section 10426 provides: "The supplemental assessment shall be made and collected in the same manner, as nearly as may be, as the first assessment. Subsequent supplemental assessments may be made, if necessary, to pay for the improvement. At the hearing the legislative body may confirm, modify, or correct the supplemental assessment. The decision of the legislative body thereon is final."

determinations and apportionment methodology were unchanged from the Original District. As with the Original District, it was determined that 100 percent of the proposed improvements specially benefited the properties within the Supplemental District. Benefit points were assigned for aesthetics, safety, and reliability. Each parcel in the Supplemental District received the same number of total benefit points as it had received in the Original District. The engineer of work again determined construction costs separately for the three zones of benefit—Del Mar Valley Area, West Hawthorne Drive Area, and Hacienda Drive Area. Thus, as reflected in the preliminary report for the Supplemental District, the methodology for the Supplemental District assessment was identical to the methodology used for the Original District assessment.

At a March 2006 meeting, the Town's council considered whether to revise the proposed boundaries of the Supplemental District, and specifically considered whether to exclude the Hacienda Drive Area from the district. The engineer of work explained that the Town could modify the boundaries of the proposed Supplemental District. The construction costs attributable to any removed properties would be deleted from the total construction costs, but any incidental costs would generally be unaffected, causing the costs to be spread among fewer properties. Following the public comment period, the Town's council adopted a resolution approving the preliminary engineer's report and finalizing the external boundaries for the Supplemental District as proposed by the engineer of work. The Town's resolution set a public hearing for May 8, 2006, for the ultimate decision on whether to form the Supplemental District. The Town was directed to mail notices and ballots to affected property owners, along with envelopes for returning the ballots to the Town's clerk, not less than 45 days before the date of the public hearing.

The Town mailed notices, ballots, and return envelopes to property owners within the proposed Supplemental District on March 24, 2006. Property owners could return their ballots to the Town's clerk at any time before the close of the public hearing on May 8, 2006. The ballots were weighted according to each parcel's proposed assessment.

On the evening of May 8, 2006, the Town's council held a public hearing to hear and consider public testimony, tally the property owner votes, and, if the property owners voted in favor of the Supplemental District, to vote on whether to establish the district. The final engineer's report for the Supplemental District contained one change from the preliminary report. Specifically, the engineer of work had determined that a parcel located at 1 Tanfield Road, which is not within the Supplemental District, would receive a special benefit from the undergrounding project. Although the parcel takes its utility service from Tanfield Road, a cul-de-sac off of Hacienda Drive that is not

part of the undergrounding project, it was determined the property has a secondary utility access point on Hacienda Drive and also has some overhead wires crossing a corner of the property that would be removed. Thus, the engineer of work assigned the property half a benefit point for aesthetics and half a benefit point for safety. The property received a total of one special benefit point, which was equivalent to $6,778 in special benefits. Because the property was not included in the Supplemental District (or the Original District), this special benefit amount of $6,778 was deducted from the total amount to be assessed. Proposed assessment amounts in the Hacienda Drive Area were reduced accordingly.[5] The Town's council adopted a resolution approving the revised assessment amounts.

The votes were tallied at the close of the public hearing. Property owners voted in favor of forming the Supplemental District by a margin of 56 percent to 44 percent. Although the overall vote totals favored creation of the Supplemental District, the vote was not so favorable within the Hacienda Drive Area. Among property owners in the Hacienda Drive Area, 12 parcels voted for the Supplemental District while 23 parcels voted against its formation. The vote as weighted by assessment amounts in the Hacienda Drive Area was $246,332.16 for and $379,762.08 against, equating to roughly 61 percent opposition to formation of the Supplemental District. All of the property owners on Noche Vista Lane, which was in an area with its utilities already located underground, voted against the Supplemental District.

Following tabulation of the vote, the Town's council adopted a resolution to create the Supplemental District. The approved supplemental assessments for single family residential parcels receiving three benefit points were $7,740 in the West Hawthorne Drive Area, $14,812.21 in the Del Mar Valley Area, and $20,331.24 in the Hacienda Drive Area.[6] Supplemental assessments for the 11 parcels in areas with utilities already placed underground ranged from $4,937.41 to $10,165.79.

On May 18, 2006, the Town filed a complaint in the Marin County Superior Court seeking to validate the Supplemental District pursuant to section 860 et seq. of the Code of Civil Procedure. The Town sought a

---

[5] For a parcel designated single family residential in the Hacienda Drive Area that received three benefit points, the proposed total assessment for the Supplemental District declined from $20,527.68 to $20,331.24, or a reduction of $196.44. Because the engineer of work's assessment methodology considered each benefit zone separately for purposes of allocating costs and calculating special benefits, the proposed assessments in the Del Mar Valley Area and the West Hawthorne Drive area were unaffected.

[6] The combined assessment from the Original District and the Supplemental District for a single family residential parcel receiving three benefit points was $20,268.19 in the West Hawthorne Drive Area, $36,529.25 in the Del Mar Valley Area, and $51,477.86 in the Hacienda Drive Area.

judgment declaring that it had the authority to collect the assessments authorized by the resolution creating the Supplemental District and that it could use the assessments as security for the issuance of bonds. It further sought a judgment that the Supplemental District was formed in conformity with all applicable provisions of law, including the Municipal Improvement Act of 1913 and article XIII D.

Appellants are 21 individuals who own property within the Supplemental District.[7] Appellants answered the Town's complaint and filed a cross-complaint against the Town, the Town's council, Doe defendants, and "All Persons Interested in the Validity of the Del Mar Valley Utility Undergrounding Supplemental Assessment District." The cross-complaint contains seven causes of action. The first cause of action seeks to nullify the election approving the Supplemental District on the ground the Town violated property owner voting procedures. The second cause of action seeks to invalidate the resolution adopting the formation of the Supplemental District on the ground the district was not lawfully formed. The third cause of action seeks declaratory relief with respect to two distinct allegations—that the Town unfairly affected the vote by misleading property owners into believing the supplemental assessments would qualify as an income tax deduction, and that it was unfair for the Town to reach a settlement with the school district in which the Town agreed to pay the school's proposed assessment in exchange for the school district abstaining from voting its 10 parcels against the Supplemental District. The fourth through sixth causes of action seek a writ of mandate directing the Town to set aside its resolution creating the Supplemental District. Among other things, appellants allege the Town violated article XIII D by creating an assessment district in which assessments on parcels exceed the reasonable cost of the proportional special benefit conferred on the parcel. The seventh cause of action seeks a declaration regarding the validity of the Supplemental District but contains no new factual allegations.

On September 12, 2006, appellants filed their opening brief in support of their petition for writ of mandate. On October 26, 2006, the Town moved for judgment on the pleadings on the ground that appellants had not raised any viable affirmative defenses in their answer. In an order dated January 3, 2007, the trial court denied appellants' petition for writ of mandate as well as the Town's motion for judgment on the pleadings. In denying the writ claims, the court determined that the Town did not abuse its discretion in determining benefits and proportional assessments for the Supplemental District. The court found there was nothing " 'plainly arbitrary' " in the Town's determinations. The court also concluded that the Town was justified in relying upon the final

---

[7] Two of the appellants, Jimmie D. Bonander and Frank Mulberg, are also parties to the lawsuit seeking to invalidate the Original District.

engineer's report and that the method of assessment described in the report was sufficient to support the determination of benefits and proportional assessments.

The Town filed a motion for summary judgment and/or summary adjudication on January 5, 2007, in which it sought to dispose of the remaining three causes of action in the cross-complaint. In an order dated April 24, 2007, the trial court granted summary adjudication as to the first and second causes of action but denied summary adjudication as to the third cause of action, at least in part. The trial court determined that the third cause of action contained two separate and distinct claims. The court granted summary adjudication as to the issue of whether the Town had misrepresented the tax deductibility of assessments but denied summary adjudication as to the issue of the propriety of the Town's settlement agreement with the school district.

Appellants agreed to dismiss, with prejudice, the remaining claim in the cross-complaint's third cause of action in order to fully resolve the matter and allow the trial court to enter final judgment in the case. (See *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 399–403 [87 Cal.Rptr.2d 453, 981 P.2d 79].) Accordingly, on October 4, 2007, the trial court entered an order of dismissal that was intended to fully resolve the action and act as a final judgment from which an appeal could be taken. This appeal followed.

#### DISCUSSION

Appellants contend the trial court erred in denying their petition for writ of mandate, asserting that the Supplemental District assessments violate the special benefit and proportionality requirements imposed by article XIII D. They also claim the trial court erred in granting summary adjudication on claims that (1) the Town unlawfully formed the Supplemental District, (2) the vote approving the Supplemental District is a nullity because the Town gave district proponents improper access to ballot envelopes during the voting period, and (3) the Town misrepresented the income tax deductibility of the assessments. Because the assessments violate the proportionality requirement of article XIII D, we agree with appellants that they are entitled to a writ of mandate invalidating the assessments and vacating the Town's resolution creating the Supplemental District.

### I. Overview of Article XIII D and Law Governing Special Assessments

■ We begin with an overview of special assessments and Proposition 218, the 1996 initiative that added article XIII D to the California Constitution. The Supreme Court explained the nature of a special assessment in *Knox v. City of Orland* (1992) 4 Cal.4th 132 [14 Cal.Rptr.2d 159, 841 P.2d

144], a pre-Proposition 218 case. "[A] special assessment is 'levied against real property particularly and directly benefited by a local improvement in order to pay the cost of that improvement.' [Citation.]" (*Knox*, at p. 142.) "[T]he essential feature of the special assessment is that the public improvement financed through it confers a special benefit on the property assessed beyond that conferred generally. [Citations.]" (*Southern Cal. Rapid Transit Dist. v. Bolen* (1992) 1 Cal.4th 654, 661 [3 Cal.Rptr.2d 843, 822 P.2d 875].) A tax is different from a special assessment. Unlike a special assessment, a tax may be levied without regard to whether the property or person subject to the tax receives a particular benefit. (*Knox v. City of Orland, supra*, 4 Cal.4th at p. 142.)

The voters approved Proposition 218, the Right to Vote on Taxes Act, in November 1996. (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 835 [102 Cal.Rptr.2d 719, 14 P.3d 930].) Proposition 218 can best be understood as the progeny of Proposition 13, the landmark initiative measure adopted in 1978 with the purpose of cutting local property taxes. (*Howard Jarvis Taxpayers Assn. v. City of Riverside* (1999) 73 Cal.App.4th 679, 681 [86 Cal.Rptr.2d 592].) One of the principal provisions of Proposition 13 "limited ad valorem property taxes to 1 percent of a property's assessed valuation and limited increases in the assessed valuation to 2 percent per year unless and until the property changed hands. [Citation.] [¶] To prevent local governments from subverting its limitations, Proposition 13 also prohibited counties, cities, and special districts from enacting any special tax without a two-thirds vote of the electorate. [Citations.]" (*Howard Jarvis Taxpayers Assn. v. City of Riverside, supra*, 73 Cal.App.4th at pp. 681–682.)

Local governments found a way to get around Proposition 13's limitations, owing in part to a determination that a "special assessment" was not a "special tax" within the meaning of Proposition 13. (See *Knox v. City of Orland, supra*, 4 Cal.4th at p. 141.) As a consequence, a special assessment could be imposed without the two-thirds vote required by Proposition 13. (*Howard Jarvis Taxpayers Assn. v. City of Riverside, supra*, 73 Cal.App.4th at p. 682.) The ballot arguments in favor of Proposition 218 declared that politicians had exploited this loophole by calling taxes "assessments" and "fees" that could be enacted without the consent of the voters.[8] (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles, supra*, 24 Cal.4th at p. 839.) Proponents of Proposition 218 claimed that "[s]pecial districts [had]

---

[8] On the court's own motion, we take judicial notice of the 1996 ballot pamphlet materials associated with Proposition 218, including the summary prepared by the Attorney General, the Legislative Analyst's analysis, and the ballot arguments for and against the initiative. (See *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1204, fn. 25 [13 Cal.Rptr.3d 630].)

increased assessments by over 2400% over 15 years" and they argued assessments were unfair, with "[t]he poor pay[ing] the same assessments as the rich." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) argument in favor of Prop. 218, p. 76.) The argument in favor of the initiative claimed that under then existing law, "[a]n elderly widow pays exactly the same on her modest home as a tycoon with a mansion." (*Ibid.*)

■ To address these concerns, the electorate approved Proposition 218, adding articles XIII C and XIII D to the California Constitution. (*Howard Jarvis Taxpayers Assn. v. City of Riverside, supra,* 73 Cal.App.4th at p. 682.) "Proposition 218 allows only four types of local property taxes: (1) an ad valorem property tax; (2) a special tax; (3) an assessment; and (4) a fee or charge. [Citations.] It buttresses Proposition 13's limitations on ad valorem property taxes and special taxes by placing analogous restrictions on assessments, fees, and charges." (*Ibid.*)

■ Article XIII D imposes both procedural and substantive limitations on a public agency's ability to impose assessments. A public agency must comply with certain notice and hearing requirements before it may adopt a special assessment. (Art. XIII D, § 4, subds. (c), (d), (e).) Also, an assessment may only be imposed if it is supported by an engineer's report and receives a vote of at least half of the owners of affected parcels, weighted "according to the proportional financial obligation of the affected property." (Art. XIII D, § 4, subds. (b), (e).)

■ A valid assessment under Proposition 218 must also satisfy the substantive requirements of section 4, subdivision (a) of article XIII D. In particular, article XIII D "tightens the definition of the two key findings necessary to support an assessment: special benefit and proportionality." (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 443 [79 Cal.Rptr.3d 312, 187 P.3d 37] (*Silicon Valley*).) "An assessment can be imposed *only* for a 'special benefit' conferred on a particular property. (Art. XIII D, §§ 2, subd. (b), 4, subd. (a).) A special benefit is 'a particular and distinct benefit over and above general benefits conferred on real property located in the district or to the public at large.' (Art. XIII D, § 2, subd. (i).) . . . Further, an assessment on any given parcel must be in proportion to the special benefit conferred on that parcel: 'No assessment shall be imposed on any parcel which exceeds the reasonable cost of the proportional special benefit conferred on that parcel.' (Art. XIII D, § 4, subd. (a).)" (*Silicon Valley, supra,* 44 Cal.4th at p. 443.)

II. *Standard and Scope of Review*

"Before Proposition 218 was passed, courts reviewed quasi-legislative acts of local governmental agencies, such as the formation of an assessment

district, under a deferential abuse of discretion standard. [Citations.]" (*Silicon Valley, supra*, 44 Cal.4th at pp. 443–444.) "[C]ourts presumed an assessment was valid, and a plaintiff challenging it had to show that the record before the legislative body 'clearly' did not support the underlying determinations of benefit and proportionality. [Citation.]" (*Id.* at p. 444.)

"The drafters of Proposition 218 specifically targeted this deferential standard of review for change. Article XIII D, section 4, subdivision (f), provides: 'In any legal action contesting the validity of any assessment, the burden shall be on the agency to demonstrate that the property or properties in question receive a special benefit over and above the benefits conferred on the public at large and that the amount of any contested assessment is proportional to, and no greater than, the benefits conferred on the property or properties in question.' " (*Silicon Valley, supra*, 44 Cal.4th at p. 444.)

In *Silicon Valley, supra*, 44 Cal.4th at page 450, our Supreme Court held that "courts should exercise their independent judgment in reviewing whether assessments that local agencies impose violate article XIII D."[9] (Fn. omitted.) This standard of review applies because "after Proposition 218 passed, an assessment's validity, including the substantive requirements, is now a constitutional question." (*Silicon Valley*, at p. 448.) Thus, as a reviewing court we exercise de novo review of "local agency decisions that have determined whether benefits are special and whether assessments are proportional to special benefits within the meaning of Proposition 218. [Citations.]" (*Id.* at pp. 448–449.)

The litigants dispute whether our independent review may extend beyond the administrative record of the Town's creation of the Supplemental District. Specifically, they disagree about whether we may consider matters contained in the administrative record associated with the Original District. The trial court limited its review to the administrative record associated with the Supplemental District. We took judicial notice of the Original District administrative record but deferred consideration of the relevance or materiality of that record.

---

[9] Because the trial court ruled on appellants' writ claims before the Supreme Court decided *Silicon Valley*, the lower court did not independently review whether the Supplemental District satisfies article XIII D. Instead, the trial court applied a deferential standard of review, relying on case law later expressly disapproved by the Supreme Court in *Silicon Valley*. (*Silicon Valley, supra*, 44 Cal.4th at p. 450, fn. 6.) Although the trial court applied what turned out to be an improper standard of review to appellants' writ claims, no purpose would be served by remanding the matter to the trial court for reconsideration under the appropriate standard because our review is de novo and affords no deference to the trial court's determinations in any event. (But see *Barber v. Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 659–660 [53 Cal.Rptr.2d 4] [reversal required where trial court failed to exercise independent judgment and appellate review limited to whether substantial evidence supports trial court's conclusions].)

Ordinarily, when we review the decision of a public agency under the substantial evidence standard, we confine our review to the administrative record of the agency's action. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) However, we are not so constrained when we exercise independent judgment in reviewing the action of a public agency. As set forth in Code of Civil Procedure section 1094.5, subdivision (e), a court authorized to exercise independent judgment may admit and consider extra-record evidence in administrative mandate proceedings if the evidence was improperly excluded by the public agency or could not have been produced through the exercise of reasonable diligence at the time of the hearing. Although the Town acknowledges this rule, it contends that appellants have made no showing as to why the Original District administrative record was not presented to the Town's council or was improperly excluded from consideration.

The more salient point, in our view, is that the Supplemental District concerns the same project as did the Original District and employs the same special benefit formulas, boundaries, zones, and methodology. Evidence concerning special benefit determinations and proportionality analyses in the Original District administrative record bears directly upon the validity of the Supplemental District, which is merely an extension of the Original District. The administrative record of the Original District cannot be characterized as evidence that was never proffered to or considered by the Town's council, which approved the formation of the Original District less than a year before it initiated proceedings to impose a supplemental assessment. Under the circumstances, we conclude it is proper to consider evidence in the Original District administrative record to the extent it relates to special benefit and proportionality determinations relied upon by the Town in creating the Supplemental District.[10]

## III. *Special Benefits*

Appellants contend the Town failed to meet its burden under article XIII D, section 4, subdivision (f) to demonstrate that the properties in question receive a special benefit over and above the benefits conferred on the public at large. We are not persuaded.

---

[10] We do not suggest that our consideration of the Original District administrative record permits us to entertain a challenge to the validity of the Original District in this appeal, which is limited to a consideration of whether the Supplemental District complies with article XIII D and other applicable law. The Original District administrative record is relevant only insofar as it supports or undermines a claim that the Supplemental District satisfies the substantive benefit and proportionality requirements of article XIII D. Nevertheless, we acknowledge that this appeal may have a bearing on the separate lawsuit challenging the Original District to the extent that litigation remains pending and raises the proportionality issue that is dispositive in this appeal.

■ Only special benefits are assessable under Proposition 218. (Art. XIII D, § 4, subd. (a).) "If a proposed project will provide both general benefits to the community and special benefits to particular properties, the agency can impose an assessment based only on the special benefits. It must separate the general benefits from the special benefits and must secure other funding for the general benefits. [Citations.]" (*Silicon Valley, supra*, 44 Cal.4th at p. 450.)

■ The state Constitution defines the term "special benefit" as "a particular and distinct benefit over and above general benefits conferred on real property located in the district or to the public at large." (Art. XIII D, § 2, subd. (i).) "General enhancement of property value does not constitute 'special benefit.' " (*Ibid.*)

A project confers a special benefit when the affected property receives a "direct advantage" from the improvement funded by the assessment. (*Silicon Valley, supra*, 44 Cal.4th at p. 452, fn. 8.) By contrast, general benefits are "derivative [and] indirect." (*Id.* at p. 453.) The key is whether the asserted special benefits can be tied to particular parcels based on proximity or other relevant factors that reflect a direct advantage enjoyed by the parcel.[11] (44 Cal.4th at pp. 455–456.)

The Supreme Court applied these principles in the seminal case of *Silicon Valley, supra*, 44 Cal.4th 431. There, the court considered whether an assessment district created by Santa Clara County for the purpose of acquiring and preserving open space satisfied article XIII D. The assessment district covered a vast area, including "approximately 314,000 parcels and over 800 square miles containing over 1 million people." (*Silicon Valley, supra*, at p. 439.) The engineer's report set the amount of the assessment at $20 for a single-family home and provided a formula for estimating the proportionate special benefit that other properties would receive. (*Ibid.*) The engineer's report enumerated seven special benefits the assessment would confer on all residents and property owners in the district, including protection of views and enhanced recreational activities, among others. (*Id.* at p. 453.)

The *Silicon Valley* court concluded that properties in the open space assessment district received no particular and distinct benefits beyond those shared by the district's property in general or by the public at large. (*Silicon Valley, supra*, 44 Cal.4th at p. 456.) The assessment district demonstrated "no distinct benefits to particular properties above those which the general public using and enjoying open space receives." (*Id.* at p. 455.) Any special benefits

[11] The analysis prepared by the Legislative Analyst for Proposition 218 included as examples of "[t]ypical assessments that provide general benefits" "fire, park, ambulance, and mosquito control assessments." (Ballot Pamp., Gen. Elec., *supra*, analysis of Prop. 218 by Legis. Analyst, p. 73.)

that might have arisen would likely have resulted from "factors such as proximity, expanded or improved access to the open space, or views of the open space. [Citation.]" (*Ibid.*) However, because the open space assessment district had "not identified any specific open space acquisition or planned acquisition, it [could not] show any specific benefits to assessed parcels through their direct relationship to the 'locality of the improvement.' " (*Id.* at pp. 455–456.) No attempt was made to tie benefits to particular parcels. (*Id.* at p. 454.) As a consequence, the court concluded the assessment failed to satisfy the special benefit requirement of article XIII D. (44 Cal.4th at p. 456.)

The Supplemental District bears little relation to the defective assessment district in *Silicon Valley*. The Town's engineer of work identified three special benefits—improved aesthetics, increased safety, and improved service reliability. Each of these benefits is tied to individual properties based on proximity to existing overhead utility lines. The benefits are neither indirect nor derivative but instead are direct and relate to specific properties.

Appellants contend the Town failed to demonstrate that the aesthetics special benefit applies to *each* property in the Supplemental District, arguing that the engineer's report makes no attempt to tie the aesthetic benefit point to specific properties. They also argue that special benefits for safety and reliability do not pass constitutional muster. In essence, they claim there is nothing to indicate that placing overhead utility lines underground would improve safety or service reliability, asserting there have been no extraordinary safety or service reliability issues in the neighborhood. Appellants' claims lack merit.

A property received an aesthetics benefit point only if it is adjacent to visible overhead utility lines. Those properties in the Supplemental District that are not adjacent to overhead utility lines received no benefit points for aesthetics.[12] Appellants' primary complaint with regard to the aesthetics benefit appears to be that the engineer of work assigned an equivalent aesthetics benefit to all parcels adjacent to overhead utility lines regardless of the degree to which the view from a parcel will be improved. However, the mere fact a particular benefit is conferred equally on most or all properties in an assessment district does not compel the conclusion the benefit is not tied to particular properties. The engineer of work explained that the key aesthetics criterion was proximity to overhead utility lines, without regard to subjective assessments of relative improvements in views.

---

[12] Appellants assert—without support—that some properties in the Supplemental District that are not adjacent to poles and overhead wires still received a benefit point for aesthetics. Because appellants have not pointed to any evidence in the record to support this assertion, we disregard it.

As for appellants' contentions regarding safety and service reliability benefits, they have offered no support for their contention that the neighborhood has been free of service reliability and safety issues. Further, it requires no independent research to support the self-evident conclusion that placing overhead utility wires underground will reduce the risk of weather-related power outages as well as the safety risk posed by downed utility poles and lines. These benefits are plainly tied to specific properties located adjacent to utility poles and lines.

Appellants further contend the Town improperly treats the general enhancement of property value as a special benefit. They cite the engineer of work's conclusion that the undergrounding project will confer specific benefits because the improvements will "specifically enhance the values of the properties within the [Supplemental] District." Appellants assert that "[p]roperty value enhancement from undergrounding of overhead utility wires is not a permissible consideration in a special assessment under [article XIII D]."

■ General enhancement of property value is a general benefit and thus not assessable under article XIII D. (*Silicon Valley, supra*, 44 Cal.4th at p. 454.) In other words, the mere fact that a project or service has the effect of enhancing property values in a community does not necessarily mean those properties enjoy a special benefit. On the other hand, the prohibition against basing assessments on *general* property value enhancements does not mean any benefit that enhances property values is a general benefit. Nearly every assessment that confers a particular and distinct advantage on a specific parcel will also enhance the overall value of that property in some respect. Such an effect does not transform a special benefit into a general benefit. An increase in property value attributable to a project that provides a direct advantage to a particular property—instead of an indirect or derivative benefit—is a specific rather than a general enhancement in property value. Here, any enhancement in property values arises from specific benefits conferred on parcels in the Supplemental District.

■ Appellants complain that the engineer's report is flawed because it determined that the undergrounding project would yield no quantifiable general benefits for the community at large or the parcels within the Supplemental District. When determining whether benefits are general or special, we must be mindful of the rationale for making the distinction. The purpose of limiting assessments to special benefits conferred on particular properties is to avoid having property owners in an assessment district pay for general benefits enjoyed by the public at large. Conversely, if a project confers particular and distinct benefits upon specific properties in an assessment district, it would be unfair to have taxpayers outside the assessment district pay for those benefits that specifically benefit only property owners

within the district. In this case, there is little reason to believe the under-grounding project will confer derivative and indirect benefits upon property owners or others outside the Supplemental District.[13]

 Furthermore, the mere fact that properties throughout the Supplemental District share the same special benefit does not render that benefit "general" and therefore an improper subject of an assessment. Section 2, subdivision (i) of article XIII D specifies that a special benefit is a "particular and distinct benefit over and above general benefits conferred on real property located in the district . . . ." As the court in *Silicon Valley* observed, in a properly drawn district—"limited to only parcels receiving special benefits from the improvement—every parcel within that district receives a shared special benefit." (*Silicon Valley, supra,* 44 Cal.4th at p. 452, fn. 8.) One might be tempted to characterize these shared special benefits as "general" because they are not "particular and distinct" or "over and above" the benefits conferred on other properties in the district. However, the Supreme Court stated it did not "believe that the voters intended to invalidate an assessment district that is narrowly drawn to include only properties directly benefiting from an improvement." (*Ibid.*) As the court explained: "[I]f an assessment district is narrowly drawn, the fact that a benefit is conferred throughout the district does not make it general rather than special. In that circumstance, the characterization of a benefit may depend on whether the parcel receives a direct advantage from the improvement (e.g., proximity to a park) or receives an indirect, derivative advantage resulting from the overall public benefits of the improvement (e.g., general enhancement of the district's property values)." (*Ibid.*)

We conclude the Town has met its burden to establish that properties in the Supplemental District receive a particular and distinct benefit not shared by the district in general or the public at large within the meaning of article XIII D.

IV. *Proportionality*

 Appellants assert that the Town failed to meet its burden under article XIII D, section 4, subdivision (f) to demonstrate that the amounts of the contested assessments are proportional to, and no greater than, the benefits conferred on the properties in question. We agree. As we explain, the assessment scheme suffers from two infirmities that result in assessments that are disproportionate to special benefits. First, the Town's apportionment method is largely based on cost considerations rather than proportional

---

[13] As explained below in part IV.B, we agree with appellants that some specially benefited parcels were not included in the Supplemental District. That problem—excluding specially benefited parcels from an assessment district—is distinct from the issue of distinguishing between general and special benefits.

special benefits. Second, properties within the Supplemental District are required to pay for special benefits conferred upon parcels that were *excluded* from the Supplemental District.

A. *Apportionment Based upon Cost Rather than Benefit*

■ Under article XIII D, "[f]or an assessment to be valid, the properties must be assessed in proportion to the special benefits received . . . ." (*Silicon Valley, supra*, 44 Cal.4th at p. 456.) The public agency bears the burden of demonstrating that the amount of any contested assessment is proportional to the benefits conferred on the property. (Art. XIII D, § 4, subd. (f).)

For the sake of clarity, it must be emphasized that an assessment is not measured by the precise amount of special benefits enjoyed by the assessed property. (*White v. County of San Diego* (1980) 26 Cal.3d 897, 905 [163 Cal.Rptr. 640, 608 P.2d 728].) Instead, an assessment reflects costs allocated according to relative benefit received. As a general matter, an assessment represents the entirety of the cost of the improvement or property-related service, less any amounts attributable to general benefits (which may not be assessed), allocated to individual properties in proportion to the relative special benefit conferred on the property. (*Ibid.*; art. XIII D, § 4, subd. (a).) Proportional special benefit is the " 'equitable, nondiscriminatory basis' " upon which a project's assessable costs are spread among benefited properties. (*White v. County of San Diego, supra*, at p. 905.) Thus, the "reasonable cost of the proportional special benefit," which an assessment may not exceed, simply reflects an assessed property's proportionate share of total assessable costs as measured by relative special benefits. (See art. XIII D, § 4, subd. (a).)

Here, the primary determinant of the assessment amount is the relative cost of constructing the capital improvement, not the proportional special benefit conferred on a property. As a consequence of this cost-based apportionment scheme, properties that receive identical special benefits pay vastly different assessments. In the case of single family residential parcels that received a total of three benefit points for aesthetics, safety, and service reliability, the different assessments for the three "benefit zones" are as follows:

West Hawthorne Drive Area: $7,740

Del Mar Valley Area: $14,812.21

Hacienda Drive Area: $20,331.24

As the numbers make clear, the assessment for a property in the Hacienda Drive Area is nearly three times the assessment for a property in the West

Hawthorne Drive Area receiving the same proportional benefit. This result violates the proportionality requirement of article XIII D.

The disproportionate assessments result directly from the engineer of work's creation of three "benefit zones" for which construction costs were determined—and apportioned—separately. The benefit zones have nothing to do with differential benefits among the three zones but instead are better characterized as "cost zones," as counsel for the Town acknowledged at oral argument. In other words, the engineer did not justify the zones based upon any differential benefit enjoyed by parcels within the different zones. Instead, the only justification for the different zones appears to be variances in cost per parcel of placing overhead utilities underground in the various areas of the Supplemental District. It is purportedly more costly to place utilities underground in the Hacienda Drive Area, where lot sizes are generally larger.

As a result of the manner in which the Town has allocated costs and determined benefits, almost all of the differential in assessments is based on cost rather than benefit. All but 23 of the 221 parcels in the Supplemental District are assigned three benefit points under the engineer of work's analysis. Thus, but for cost differentials, 198 of the 221 parcels would have identical assessments, if total project costs were divided among all parcels in proportion to special benefits. There are three different assessment amounts among those 198 parcels only because the engineer of work chose to determine and allocate costs separately in each of the three zones of benefit.

The Town acknowledges that the engineer of work allocated the cost of undergrounding based on varying construction costs throughout the Supplemental District. It claims that if construction costs were not determined and allocated zone by zone, then smaller properties in more dense areas, such as the West Hawthorne Drive Area, would subsidize undergrounding in less dense areas with larger lot sizes, such as the Hacienda Drive Area. The Town asserts that this result is prohibited by article XIII D.

The Town's approach has a certain appeal. After all, an apportionment method that determines assessments based upon the actual cost of constructing the improvement on each property, or within a particular neighborhood, would appear to be equitable. However, there are a variety of problems with the Town's approach.

 Among other things, the Town's apportionment method violates the express terms of article XIII D, which specifies that the "proportionate special benefit derived by each identified parcel shall be determined in relationship to

the *entirety of the capital cost of a public improvement . . . .*" (Art. XIII D, § 4, subd. (a), italics added.) Thus, article XIII D expressly contemplates that proportionate special benefit is a function of the total cost of a project, not costs determined on a property-by-property or a neighborhood-by-neighborhood basis.[14] Further, subdivision (f) of section 4 of article XIII D states that it is the public agency's burden to demonstrate that the "amount of any contested assessment is proportional to, and no greater than, the *benefits* conferred on the property or properties in question." (Italics added.) The critical inquiry, therefore, concerns the special benefits conferred on the property. Properties that receive the same proportionate special benefit pay the same assessment, without regard to variations in the cost of construction among the properties.

There may be cases in which the relative cost of an improvement is a reliable measure of relative benefit conferred. This relationship does not always hold true, however. For example, one could envision an undergrounding project in which all properties receive an identical benefit—e.g., all the benefited properties sit on level ground, are the same size, have exactly the same street frontage, and have essentially the same view of overhead utility lines that will be removed. Assume for purposes of this hypothetical that it is substantially more expensive to place utilities underground in front of a particular group of properties because of the condition of the ground on which the homes sit (e.g., they are situated on top of solid rock that makes it difficult to dig trenches). Under the Town's logic, those properties should be assessed more to avoid having neighboring properties subsidize the properties' greater costs, even though it is acknowledged the project confers the same proportionate special benefit on all properties.

 The fallacy in this approach is that it assumes the costs associated with particular properties—or a particular neighborhood—can be considered in isolation. To the contrary, the costs of an improvement project must be considered as a whole. A public improvement such as a utility undergrounding project is either undertaken in an entire district or not at all. In the hypothetical involving certain properties with higher construction costs, the

---

[14] We are aware that the ballot materials for Proposition 218 explained that one purpose of the measure was to ensure that "no property owner's assessment is greater than the cost to provide the improvement or service to the owner's property." (Ballot Pamp., Gen. Elec., *supra,* analysis of Prop. 218 by Legis. Analyst, p. 74.) We do not read this statement to suggest that individual assessments may be determined based on the actual construction cost associated with a particular property. Instead, the "cost to provide the improvement" to a particular property necessarily takes into account the project's costs as a whole, apportioned to that property in an equitable manner according to special benefit. This interpretation is consistent with the express terms of article XIII D as well as other statements in the ballot materials, where it was clarified that "[a]ssessments are limited to the special benefit conferred." (Ballot Pamp., Gen. Elec., *supra,* official title and summary of Prop. 218 prepared by the Attorney General, p. 72.)

neighboring properties enjoy the benefits of the undergrounding project *only* because the project was pursued in the entire assessment district, which necessarily includes the properties with higher construction costs.[15] It is for this reason that the individual assessments for benefited properties must be apportioned in relation to the *entirety* of the project's assessable costs, as article XIII D requires. (Art. XIII D, § 4, subd. (a).) To reiterate, proportionate special benefit is the basis upon which a project's total assessable costs are apportioned among parcels within an assessment district. This method ensures that each property owner pays an equitable share of the overall assessable cost as measured by the relative special benefit conferred on the property.

We do not suggest the Town should have applied equal assessments to each of the properties in the Supplemental District. It may be that lot size, length of street frontage with overhead wires, and/or some combination of similar factors are proper considerations in determining each property's relative special benefit. For example, in *Dahms v. Downtown Pomona Property & Business Improvement Dist.* (2009) 174 Cal.App.4th 708, 720–721 [96 Cal.Rptr.3d 10] (*Dahms*), the Court of Appeal determined that an assessment for a downtown business district was properly apportioned based on building size, street frontage, and lot size. The apportionment formula (40 percent front footage, 40 percent building size, and 20 percent lot size) reflected that larger businesses would receive proportionally greater benefits from the business district than would businesses in smaller buildings on smaller lots. (*Id.* at pp. 720–721.) Here, the Town did not establish or even suggest that lot density was a proper determinant of proportional special benefit.

During oral argument in this matter, the Town's counsel suggested the recently decided case of *Dahms* supports the proposition that properties may be assessed in proportion to the cost of providing an improvement, as opposed to the special benefit conferred by the improvement. The case stands for no such principle. The court in *Dahms* stated that the formula for determining special benefit turned upon lot size and street frontage because some properties received "more special benefit than others." (*Dahms, supra,* 174 Cal.App.4th at p. 720.) Specifically rejecting an argument that the

---

[15] The Town complains that aggregating costs for an entire improvement project causes low-cost areas to subsidize high-cost areas. This is not necessarily so. It may be that the proportional special benefit conferred on properties in the area with lower construction costs is less than that conferred on properties in the area with higher construction costs, resulting in proportionally larger assessments in the high-cost area. In any event, because the low-cost properties cannot enjoy the benefits of the improvement project without inclusion of the high-cost properties in the district, it is only fair that the entirety of the assessable construction cost is spread among all properties in proportion to special benefits.

apportionment formula should have been based on the total length of streets bordering all sides of a business instead of the business's front street footage, the court explained that "[i]t makes sense to use front footage rather than total street length to determine the *proportional special benefit* that a parcel will derive from the services of the [business district] (e.g., increased security, litter removal, and graffiti removal). For example, a clean and safe front entrance to a commercial parcel is more likely to constitute a *special benefit* to that parcel than a clean and safe side or rear, where there may or may not be any entrance at all. At the same time, the City's formula also takes into account other measures (namely, building size and lot size) of each parcel's size and consequent *proportional special benefit*, and those other measures should compensate for any disproportionality that might have resulted from exclusive reliance on front footage." (*Id.* at p. 721, italics added.) The apportionment formula in *Dahms* turned on special benefits and not upon costs.

Even if it were proper to divide the Supplemental District into different zones based upon special benefits conferred on properties in each of the zones, the approach followed by the Town nevertheless lacks adequate support in the record. As the map of the Supplemental District reflects, lots in the West Hawthorne Area are smaller, as are lots in the lower portion of the Del Mar Valley Area. Lots in the Hacienda Drive Area are larger, but so too are lots in the upper areas of the Del Mar Valley Area. Thus, if lot density were a determinant of special benefit conferred on a parcel, the division of zones selected by the engineer of work is illogical. The upper parts of the Del Mar Valley Area should be treated no differently than the Hacienda Drive Area; the lot sizes appear to be no different. In fact, many of the lots in the upper Del Mar Valley Area appear to be larger than lots in the Hacienda Drive Area, so it would appear that, under the Town's logic, the Hacienda Drive Area is actually subsidizing the upper reaches of the Del Mar Valley Area. In short, the manner in which the engineer of work divided the Supplemental District into three zones of benefit appears to be arbitrary, even assuming lot density has some bearing on proportionate special benefit. The engineer provided an inadequate justification for the particular boundaries delineating the benefit zones.

B. *Specially Benefited Properties Excluded from the Supplemental District*

Section 4, subdivision (a) of article XIII D provides that an agency proposing to "levy an assessment shall identify all parcels which will have a special benefit conferred upon them and upon which an assessment will be imposed." As contemplated by this constitutional provision, the boundaries of an assessment district are dictated by a determination of which properties

receive special benefits. If a property receiving a special benefit is excluded from the assessment district, then the assessments on properties included in the district will necessarily exceed the proportional special benefit conferred on those properties. In such a case, the properties in the assessment district effectively subsidize the special benefit enjoyed by properties outside the district that pay no assessment.

Here, the Town excluded certain properties from the Supplemental District even though they receive special benefits. Specifically, the engineer of work saw fit to exclude two streets from the Supplemental District—Tanfield Road and Acacia Court. These streets are cul-de-sacs that extend off of Hacienda Drive. Tanfield Road has overhead utility lines and is not part of the undergrounding project. Acacia Court already has its utility lines placed underground and is also not part of the project. Based on maps contained in the record on appeal, it appears that nine parcels are located on Tanfield Road, while seven parcels are located on Acacia Court. There appears to be no dispute that both Tanfield Road and Acacia Court receive their electrical, telephone, and cable utilities from Hacienda Drive.

Initially, the engineer of work assigned no benefit points to the Tanfield Road and Acacia Court properties. However, in the final engineer's report, the engineer of work identified a parcel at 1 Tanfield Road, located at the corner of Tanfield Road and Hacienda Drive, that receives a special benefit from the proposed undergrounding project. The engineer determined that the property has a "secondary access point" on Hacienda Drive and that overhead wires crossing a corner of the property are slated to be removed during the undergrounding project. The engineer's report assigned the property half the benefit for aesthetics and half the benefit for safety, resulting in one full benefit point. Because the property was not included in the Supplemental District, the assessment that would have otherwise been applied to the property was deducted and "not assessed to the rest of the properties in the [Supplemental] District." In other words, the engineer of work deducted the cost of the proportional special benefit conferred on 1 Tanfield Road in order to prevent the properties in the Supplemental District from subsidizing that property's special benefit and paying correspondingly higher assessments as a result.

Our independent review indicates that all of the properties on Tanfield Road and Acacia Court should have been assigned special benefits, if the engineer of work's methodology had been applied consistently. Those properties are situated no differently than the properties on Noche Vista Lane and Geldert Court which, as previously discussed, are in areas where the utilities have already been placed underground. In the case of Noche Vista Lane, a cul-de-sac off of Hacienda Drive, and Geldert Court, a cul-de-sac off of

Geldert Drive, the engineer of work determined the properties in those areas received half the benefit from service reliability and half the benefit from improved safety. The engineer reasoned that "their small systems are completely surrounded by and dependent on the larger overall system that is to be undergrounded . . . ." As a result, the properties benefit from increased service reliability. With respect to the safety benefit, the engineer reasoned that "ingress and egress from their property is directly affected by overhead lines and poles."

This reasoning applies equally to the excluded Tanfield Road and Acacia Court properties. The properties on Acacia Court, in particular, share the same reliability and safety benefits as the properties on Noche Vista Lane and Geldert Court.[16] Although the utilities on Acacia Court are already placed underground, its system is completely dependent upon the larger system that is being undergrounded. Further, ingress and egress from the property is through Hacienda Drive and is therefore directly affected by overhead lines and poles. If the engineer of work's methodology had been consistently applied, the seven parcels on Acacia Court should have received one benefit point each, composed of one-half of the reliability benefit and one-half of the service benefit. The same reasoning should also apply to the nine or so parcels on Tanfield Road, even though they will not have their utilities placed underground. They will enjoy increased service reliability because their system is completely dependent upon the larger overall system that is being undergrounded. There is less chance that downed power lines in the Supplemental District will cause a service interruption in their neighborhood. Moreover, they enjoy a safety benefit because ingress and egress to their cul-de-sac is through areas where overhead utilities will be placed underground.

Property owners in the Supplemental District are effectively subsidizing special benefits received by properties on Tanfield Road and Acacia Court.

---

[16] Although the final engineer's report purports to justify the exclusion of Acacia Court from the Supplemental District on the ground its utility poles and lines have already been placed underground, the report contains no explanation as to why that street is treated differently from Noche Vista Lane or Geldert Court, which have also had utility lines and poles placed underground. One possible explanation for the differential treatment is that Noche Vista Lane is completely surrounded by the Supplemental District, whereas Tanfield Road and Acacia Court are not surrounded by the Supplemental District but instead are situated at its border. This explanation fails to justify the differential treatment, however, because the safety and service reliability benefits do not turn on whether a property is "surrounded" by other properties included in the district. Instead, the relevant criteria in assigning these benefits are (1) the source of the utilities supplying electrical, cable, and telephone services to the area, and (2) whether ingress and egress to the property is through areas that will have their utilities placed underground. For all practical purposes, Tanfield Road and Acacia Court are "surrounded" by the Supplemental District because they receive their utilities from the Supplemental District and ingress and egress is through the Supplemental District.

The exclusion of those areas from the Supplemental District causes the assessments to exceed the proportionate special benefit conferred on each parcel. This outcome violates the proportionality requirement of article XIII D, section 4, subdivision (a).

At oral argument, counsel for the Town acknowledged there may be imperfections in the way the Supplemental District is drawn, such as the exclusion of Tanfield Road and Acacia Court. Counsel nonetheless urged that we uphold the validity of the Supplemental District in spite of its imperfections, reasoning in effect that no special assessment district could survive scrutiny if courts expected rigorous mathematical precision in the calculation and apportionment of assessments. We agree with the Town in principle. Any attempt to classify special benefits conferred on particular properties and to assign relative weights to those benefits will necessarily involve some degree of imprecision. For example, in this case the engineer assigned equal weight to the three special benefits—aesthetics, service reliability, and safety. While this formula may be a legally justifiable approach to measuring and apportioning special benefits, it is not necessarily the only valid approach. Whichever approach is taken to measuring and apportioning special benefits, however, it must be both defensible and consistently applied.

Here, the analysis adopted by the engineer was applied inconsistently. The result is that parcels on Noche Vista Lane were assessed for the Supplemental District while parcels on Acacia Court—which should have been treated the same as those on Noche Vista Lane—were not assessed at all. This disparity is not the product of excusable imprecision but instead reflects an inconsistent approach to imposing assessments. Taken together with the fact that assessment amounts are based on relative cost instead of proportionate special benefit, the flaws in the Supplemental District are simply too great to disregard as mere "imperfections."

In summary, because differences in assessments are primarily driven by *cost* differentials, the assessments are disproportionate, with parcels receiving the same special benefits assigned substantially different assessment amounts. Additionally, because certain parcels that receive a special benefit were excluded from the Supplemental District, the assessments exceed the proportional special benefit conferred on each parcel in the Supplemental District. Accordingly, we conclude the Supplemental District violates the proportionality requirement of article XIII D. In light of this conclusion, we need not reach the other arguments appellants raise.[17]

---

[17] We deny as moot appellants' request for judicial notice of the legislative history of Government Code section 53753.

## Disposition

The judgment is reversed and the matter is remanded to the trial court with directions to enter a new judgment granting appellants' petition for writ of mandate. The trial court shall issue a writ vacating the Town of Tiburon's resolution No. 24-2006 and invalidating the assessments imposed by the Del Mar Valley Utility Undergrounding Supplemental Assessment District. Appellants shall recover their costs on appeal.

Siggins, J., and Jenkins, J., concurred.

A petition for a rehearing was denied March 30, 2010.