[No. S151370. June 8, 2009.]

JIMMIE D. BONANDER et al., Plaintiffs and Appellants, v.
TOWN OF TIBURON et al., Defendants and Respondents.

COUNSEL

Frank I. Mulberg and Brett D. Mulberg for Plaintiffs and Appellants.

Jack D. Cohen as Amicus Curiae on behalf of Plaintiffs and Appellants.

Trevor A. Grimm, Jonathan M. Coupal and Timothy A. Bittle for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Ann R. Danforth, Town Attorney; McDonough Holland & Allen, Thomas R. Curry, Andrea S. Visveshwara and Kevin D. Siegel for Defendants and Respondents.

Colantuono & Levin, Michael G. Colantuono and Amy C. Sparrow for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**KENNARD, J.**—Under the Municipal Improvement Act of 1913 (Sts. & Hy. Code, § 10000 et seq.), an assessment district may be formed and assessments may be levied on real property for various purposes, including moving overhead utility wires underground, as occurred here. Under article XIII D of the state Constitution, however, any assessment on real property must be in proportion to the special benefit conferred on that property. (See *Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 443 [79 Cal.Rptr.3d 312, 187 P.3d 37].) When a lawsuit

challenges the assessments imposed on specific parcels of real property for (among other things) noncompliance with article XIII D, must the plaintiff comply with the requirements governing validation proceedings brought under Code of Civil Procedure sections 860 through 870.5? We conclude that the answer is "no." Because the Court of Appeal reached the opposite conclusion, we reverse its judgment.

## I

In May 2003, owners of 116 parcels in the Town of Tiburon (hereafter the Town) in Marin County petitioned the Town to create an assessment district in Del Mar Valley to install underground utility wires carrying electricity, telephone signals, and other cable services, replacing overhead wires strung from poles.

On June 4, 2003, the Town's council adopted a resolution of intention to form the proposed assessment district under the Municipal Improvement Act of 1913. The Town then engaged a civil engineer to prepare a report analyzing the proposed project. On March 10, 2005, the civil engineer submitted a preliminary engineer's report, which the Town's council approved on March 16, 2005. As the special benefit that would be conferred on the 221 parcels located in the proposed district, the report identified the new underground electrical, telephone, and cable facilities that would be "the direct source of service to the properties." In determining the special benefit conferred on each individual parcel, the report assigned points based on three benefit categories: (1) aesthetic benefit from removal of unsightly poles and overhead wires, (2) improved safety because of the reduced risk of downed poles and wires, and (3) greater service reliability because of new wiring and equipment. The estimated cost of the project was $4,720,000, of which construction costs represented $3,900,611. The proposed individual assessments ranged from about $7,200 to about $31,200 per parcel, with $21,717.04 being the most frequent assessment.

On March 30, 2005, notices of a public hearing and ballots were sent to the owners of parcels within the proposed assessment district. Each ballot was weighted to reflect the amount of the proposed assessment for the parcel in question. Owners of parcels representing 71 percent of the total proposed assessment voted in favor of the project.

On May 12, 2005, the Town received a final engineer's report, and on May 18, 2005, the Town's council voted unanimously to approve that report, to order the improvements, to establish the Del Mar Valley Utility Undergrounding Assessment District, and to confirm the proposed individual assessments. On May 27, 2005, assessment notices were sent to property owners within the new assessment district.

Two couples, Jimmie D. and Jean Bonander and Frank and Shelley Mulberg, had previously objected to inclusion of their parcels in the district. The assessment levied against each of their parcels was $31,146.62. On June 16, 2005, the Bonanders and the Mulbergs filed a "Petition for Writ of Administrative Mandamus or Mandate and Complaint for Declaratory and Injunctive Relief" (hereafter complaint) in the superior court, alleging four causes of action—three of them for administrative mandate and the fourth seeking declaratory relief. The complaint named as defendants the Town, its council, and 20 unnamed Does.

The complaint alleged that the assessment district, as formed, violated article XIII D of the state Constitution because the apportionment method used by the district resulted in assessments against plaintiffs' parcels that exceeded the special benefit to be conferred on those parcels. According to plaintiffs, their lots would receive no aesthetic benefit at all and little, if any, safety or reliability benefit, because after the project's completion utility poles and overhead wires would remain nearby. The complaint further alleged that the assessment district was infirm because (1) the petition initiating the creation of the district was inadequate, (2) the Town's resolution of intention to form the district was also inadequate, (3) the Town's engineers had drawn the district's boundaries by "cherry picking and gerrymandering," (4) the boundaries adopted were the product of "tainted voting," and (5) the zones created within the district prevented a fair allocation of construction costs. The complaint sought not only to set aside the assessments on plaintiffs' parcels but also to invalidate the Town's May 18, 2005, resolution, which established the assessment district and confirmed the individual assessments.

On June 17, 2005, plaintiffs served the summons and complaint on the Town, but they did not serve the owners of the other 219 parcels within the district.

On August 2, 2005, the Town answered the complaint, alleging several affirmative defenses, including that plaintiffs' claims were barred as untimely under Streets and Highways Code section 10400 and that plaintiffs had failed to file, within 60 days of the complaint's filing date, proof of service by newspaper publication, as required under Code of Civil Procedure sections 861 and 863.

On August 15, 2005, the 60th day after the filing of the complaint, plaintiffs mailed a modified copy of the summons and complaint to the record owners of the parcels in the assessment district. To a copy of the summons (which was directed only to the Town, the Town's council, and 20 unnamed Does) plaintiffs added this handwritten notation: "8/15/05—To All Interested Parties [¶] SEE NOTICE ATTACHED TO SUMMONS." The attached sheet, addressed to "ALL PERSONS INTERESTED IN THE MATTER OF THE DEL MAR UTILITY UNDERGROUNDING ASSESSMENT DISTRICT," advised: "You may contest the legality or validity of the matter by appearing and filing a written answer to the complaint not later than SEPTEMBER 20, 2005." That same day, plaintiffs filed proof of service by mail of the modified summons on the other property owners.

On August 17, 2005, plaintiffs applied ex parte for an order amending the caption on their summons to include "all interested persons," thereby attempting to bring the summons into compliance with Code of Civil Procedure section 863. Plaintiffs, however, did not concede that this statute applied.

The trial court granted plaintiffs' application and authorized issuance of the amended summons. Plaintiffs then published the amended summons and its attached notice in a local newspaper, once per week, for four successive weeks, from August 19 through September 9, 2005, thereby attempting to come into compliance with Code of Civil Procedure section 861. On September 9—85 days after the complaint was filed—plaintiffs filed proof of publication of the amended summons.

On September 23, 2005, the Town filed a motion to dismiss based on plaintiffs' failure to timely comply with Code of Civil Procedure sections 861, 861.1, and 863, which require—in actions to which they apply—that the summons be directed to " 'all persons interested' " (*id.*, § 861.1) and that proof of publication be filed within "60 days from the filing of [the] complaint" (*id.*, § 863). Plaintiffs had missed that deadline by 25 days.

On November 3, 2005, the trial court ordered dismissal of the complaint. Based on the complaint's allegations and requests for relief, the court ruled that plaintiffs' action was a "special statutory action challenging the formation of a local public improvement district or assessment district and the subsequent levy of an assessment," making the action a validation proceeding "subject to special statutory [procedures] codified in . . . Code of Civil Procedure [section 860 et seq.]" Because plaintiffs had failed to file proof of service by publication within the requisite 60 days from the filing of the complaint (Code Civ. Proc., § 863), and because they had failed to show good cause for their delay (*ibid.*), the trial court dismissed the complaint. The Court of Appeal affirmed.

## II

The issue before us is whether the general validation procedure set forth in Code of Civil Procedure sections 860 through 870.5 applies when a property owner contests an individual assessment levied under the Municipal Improvement Act of 1913 (Sts. & Hy. Code, § 10000 et seq.). To shed light on what the Legislature intended by provisions that it enacted in the early part of the last century, we must examine the history of special assessment districts in California and, in particular, the ways in which property owners have contested the validity of those districts.

### A. *Early Cases in Which Property Owners Contested the Validity of Special Assessments*

For well over a century, California law has allowed public agencies to use special assessment districts to finance specific types of improvements that benefit the real property located within the district. Many of the early assessment districts were created for the purpose of reclaiming swampland, although assessment districts were also frequently used to finance street improvements.

An interested property owner could participate in the proceedings that led to the creation of the assessment district, and after the district was formed and the assessments levied, property owners frequently brought actions contesting the validity of their individual assessments. When the boundaries of the district and the amount of the individual assessments were determined by a local board exercising discretionary authority, property owners could petition the superior court for a writ of review, and in that way contest the validity of

the proceedings that led to the assessment. (See, e.g., *Miller & Lux v. Board of Supervisors* (1922) 189 Cal. 254 [208 P. 304]; *Imperial Water Co. v. Supervisors* (1912) 162 Cal. 14 [120 P. 780]; *Peterson v. Board of Supervisors* (1924) 65 Cal.App. 670 [225 P. 28].) In other cases, property owners brought actions for declaratory or injunctive relief (see, e.g., *Imperial Land Co. v. Imperial Irr. Dist.* (1916) 173 Cal. 668 [161 P. 116]; *Imperial Land Co. v. Imperial Irr. Dist.* (1916) 173 Cal. 660 [161 P. 113]; *Southwick v. Santa Barbara* (1910) 158 Cal. 14 [109 P. 610]), or, because the assessment was a lien against the property, they brought actions to quiet title (see, e.g., *Larsen v. San Francisco* (1920) 182 Cal. 1 [186 P. 757]; *Ahlman v. Barber Asphalt Pav. Co.* (1919) 40 Cal.App. 395 [181 P. 238]). In addition, property owners could challenge the validity of an assessment as a defense in an action brought to enforce the assessment. (See, e.g., *Swamp Land etc. Dist. 341 v. Blumenberg* (1909) 156 Cal. 539, 541 [106 P. 392]; *Reclamation Dist. 531 v. Phillips* (1895) 108 Cal. 306, 311 [41 P. 335]; *Reclamation Dist. No. 108 v. Evans* (1882) 61 Cal. 104, 107.) In some cases, the legislative act authorizing formation of the assessment district expressly conferred on property owners the right to bring actions challenging their individual assessments. (See, e.g., Stats. 1897, ch. 189, § 69, p. 276.)

These were private law actions between the property owner and the public agency levying the assessment, or sometimes between the property owner and the contractor, and no special rules of procedure governed these actions. If a property owner successfully contested the assessment against his or her property, that owner was relieved of the obligation to pay the assessment, but other property owners who had not challenged their assessments remained obligated. (See *Reclamation Dist. No. 108 v. Evans, supra*, 61 Cal. at p. 107.) Thus, in some cases the revenue of the assessment district might fall short of what was originally contemplated. This shortfall might result in scaling down the planned improvements, adding or increasing financial contributions by the local government, or levying a new assessment to raise additional funds.

To address the uncertainties associated with property owners bringing actions to contest their assessments, the Legislature enacted former Political Code section 3493 1/2 (Stats. 1893, ch. 176, § 1, pp. 208–210), relating specifically to assessment districts created to reclaim swampland. (See *Swamp Land etc. Dist. 341 v. Blumenberg, supra*, 156 Cal. at pp. 541–542; *Reclamation Dist. No. 551 v. Runyon* (1897) 117 Cal. 164, 166 [49 P. 131].) Former Political Code section 3493 1/2 permitted public agencies to bring validation actions against the owners of properties within an assessment

district to have the district (and the individual assessments) judicially approved. If the public agency prevailed, the validity of the individual assessments could not be contested in any later action.[1] This was the first validation provision applicable to assessment districts in California.

### B. *Improvement Acts of 1911 and 1913*

Over the next several decades, new acts of the Legislature authorized public agencies to form assessment districts for a variety of specified purposes, in some cases replacing previous legislative enactments. One such act was the Improvement Act of 1911 (Stats. 1911, ch. 397, §§ 1–83, pp. 730–769), which provided for improvement of streets within municipalities and further provided for the issuance of street improvement bonds to pay for the improvements. Another such act was the Municipal Improvement Act of 1913 (Stats. 1913, ch. 247, §§ 1–20, pp. 421–429), which provided for the construction of water works, electric power works, gas works, lighting works, and other public utilities; for the assessment of costs upon the benefited properties; and for the issuance of improvement bonds.

The Municipal Improvement Act of 1913 is the act at issue here. When first enacted, section 6 provided: "The validity of an assessment levied under this act shall not be contested in any action or proceeding unless the same is commenced within thirty days after the time said assessment is levied . . . ." (Stats. 1913, ch. 247, § 6, p. 424.) Although this provision reads as a statute of limitations, it implicitly authorizes property owners to bring actions to contest assessments. It has not been substantively amended since its original enactment. (See Sts. & Hy. Code, § 10400.)

In 1937, the Legislature amended the Improvement Act of 1911 to allow the legislative body conducting the proceedings to bring a validation action. Specifically, section 16 of the Improvement Act of 1911 was amended to provide, in part: "At any time after bids have been received [for a street improvement] and prior to the date fixed for the beginning of work, the legislative body conducting the proceedings may bring an action in the superior court of the county in which the city lies to determine the validity of such proceedings and the validity of any contract entered or to be entered

---

[1] Specifically, former Political Code section 3493 1/2 provided: "At any time within one year after the filing of the list [of the charges assessed against each tract of land], the Board of Trustees of the [reclamation] district may, in the name of the district, commence and prosecute an action in the Superior Court of the county in which the district is situated . . . to determine the validity of the assessment; and in said action, any one or more of the owners of land embraced within the district may . . . be made defendants in said action. [¶] . . . [¶] . . . [T]he judgment given and made in the action brought under the provisions of this section shall be conclusive between the parties thereto as to the validity or invalidity of the assessment . . . ." (Stats. 1893, ch. 176, § 1, pp. 208–210.)

pursuant thereto. Any contractor to whom a contract has been awarded may . . . bring such an action to determine the validity of such proceedings and of such contract. Such action shall be in the nature of a proceeding in rem, and jurisdiction of all parties interested may be had by publication of summons . . . in some newspaper of general circulation published in the county where the action is pending . . . . [¶] . . . If the validity of the proceedings and of the contract or proposed contract is sustained, the validity of such proceedings or contract shall not thereafter be contested in any action . . . ." (Stats. 1937, ch. 602, § 1, pp. 1672, 1673–1674.)

In 1941, the Legislature incorporated this validation scheme from the Improvement Act of 1911 into the Municipal Improvement Act of 1913. At that time, section 18 of the Municipal Improvement Act of 1913 (later codified, in relevant part, as Sts. & Hy. Code, § 10601 (Stats. 1953, ch. 192, § 4, pp. 1179, 1192)) was amended to provide, in part: "The city council, at any time after the publication of any resolution of intention adopted hereunder, or the ordering of the improvement or acquisition, or the confirmation of the assessment, or ordering the issuance of bonds, and any contractor, at any time after the award of contract to him, may bring an action in the superior court of the county in which said city is located, to determine the validity of said proceedings, assessment, bonds, contract, improvement or acquisition, or any thereof. Such action shall be brought pursuant to and be governed by the provisions of, and shall have the effect, as provided in Section 16 of [the] Improvement Act of 1911, except as herein otherwise provided." (Stats. 1940 1st Ex. Sess., ch. 35, § 7, p. 93.) As noted, section 16 of the Improvement Act of 1911 provided for notice by newspaper publication. (Stats. 1937, ch. 602, § 1, pp. 1672, 1673.)

Significantly, only the "city council" (later broadened to be the "legislative body" (Stats. 1953, ch. 192, § 4, pp. 1179, 1192)) and the "contractor" could bring the validation action contemplated by this 1941 amendment to the Municipal Improvement Act of 1913. Obviously these parties were interested in *confirming* the validity of the assessment, not *contesting* it: The legislative body had levied the assessment and generally would have no reason to contest its validity, and the contractor had an interest in confirming the assessment in order to ensure full payment. Therefore, actions to contest the validity of the assessment were not governed by section 18 of the Municipal Improvement Act of 1913, including its requirement of notice by newspaper publication. Rather, section 6 of that act (later codified as Sts. & Hy. Code, § 10400 (Stats. 1953, ch. 192, § 4, pp. 1179, 1186))[2] continued to be the only statute governing such actions, and it did not require any special notice procedures.

---

[2] Unless otherwise indicated, all further statutory references are to the Streets and Highways Code.

### C. *General Validation Procedure (Code Civ. Proc., §§ 860–870)*

■ By 1961, the California codes contained a patchwork of provisions governing validation proceedings, with each set of provisions dedicated to a different statutory scheme. In that year, the Legislature sought to replace this patchwork with a general validation procedure. (Stats. 1961, ch. 1479, §§ 1–3, pp. 3331–3332.) This procedure, which the Legislature codified as Code of Civil Procedure sections 860 through 870, does not, in itself, authorize any validation actions; rather, it establishes a uniform system that other statutory schemes must activate by reference. At the time the Legislature enacted this general validation procedure, it revised *80* statutory schemes, deleting existing provisions governing validation proceedings and referring instead to the new uniform system. (Stats. 1961, chs. 1480–1559, pp. 3333–3381.)

The judgment in a proceeding brought under the general validation procedure is "binding and conclusive . . . against the agency *and against all other persons* . . . ." (Code Civ. Proc., § 870, subd. (a), italics added.) Because the proceeding is in the nature of an action against the entire world, "[j]urisdiction of all interested parties may be had by [newspaper] publication of summons . . ." and such other notice as the court may order. (*Id.*, § 861.) More importantly, the general validation procedure is broad enough to include actions to *invalidate* public agency matters (sometimes called reverse validation actions). Code of Civil Procedure section 863 permits "*any interested person* [to] bring an action . . . to determine the validity of [the] matter" (italics added), and the phrase "any interested person" might of course include a party contesting the matter in question.

### III

The Municipal Improvement Act of 1913 was one of the statutory schemes that the Legislature revised in 1961 to make reference to the new general validation procedure. Section 10601 (which codified the relevant portion of what had been § 18 of the act) was amended to read: "An action to determine the validity of the assessment, bonds, contract, improvement or acquisition may be brought by the legislative body or by the contractor pursuant to Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure. . . . Notwithstanding any other provisions of law, the action authorized by this section shall not be brought by any person other than the legislative body or the contractor, nor except when permitted by Section 10400 shall the action be brought after the date fixed for the beginning of work." (Stats. 1961, ch. 1526, § 1, p. 3364.)

The apparent intent of the Legislature in making this 1961 amendment to section 10601 was to incorporate the general validation procedure into the

Municipal Improvement Act of 1913 *but without otherwise substantively changing the law.* Under the previously existing procedure, validation actions under section 10601 had to be brought in accordance with the provisions governing validation actions brought under the Improvement Act of 1911 (Stats. 1940 1st Ex. Sess., ch. 35, § 7, p. 93), and therefore they had to be brought "prior to the date fixed for the beginning of work" (Stats. 1937, ch. 602, § 1, pp. 1672–1674). Accordingly, when the Legislature amended section 10601 to incorporate the general validation procedure, it expressly provided that the action could not "be brought after the date fixed for the beginning of work." (Stats. 1961, ch. 1526, § 1, p. 3364.)

More importantly, under the previously existing procedure only the *legislative body* or the *contractor* could bring a validation action (see p. 655, *ante*), and these actions were, by implication, aimed at *confirming* the validity of the assessment proceedings, not at contesting that validity. The general validation procedure, however, is broad enough to include reverse validation actions aimed at *contesting* the validity of public agency matters. (See Code Civ. Proc., § 863.) Therefore, when the Legislature in 1961 amended section 10601 to incorporate the general validation procedure, it expressly limited which parties might avail themselves of the new procedure: "Notwithstanding any other provisions of law, the action authorized by this section shall not be brought by any person other than the legislative body or the contractor . . . ." (Stats. 1961, ch. 1526, § 1, p. 3364.)

The legislative history of the 1961 amendment to section 10601 supports this analysis. The amendment was enacted by Assembly Bill No. 1462 (1961 Reg. Sess.) (Assembly Bill 1462). As originally introduced, Assembly Bill 1462 would have amended section 10601 to provide in relevant part: "An action to determine the validity of the assessment, bonds, contract, improvement or acquisition may be brought pursuant to Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure." (Assem. Bill 1462, as introduced Feb. 8, 1961.) Later in the legislative process, this sentence was revised to insert the words *"by the legislative body or by the contractor."* (Assem. Bill 1462, as amended in Sen., May 29, 1961, italics added.) In addition, the sentence was added that reads: "Notwithstanding any other provisions of law, the action authorized by this section shall not be brought by any person other than the *legislative body or the contractor,* nor except when permitted by Section 10400 shall the action be brought after the date fixed for the beginning of work." (*Ibid.,* italics added.) These changes confirm that the Legislature specifically intended to preserve the existing limitations in section 10601, and therefore that it did not intend to incorporate the uniform validation procedure in its entirety into the Municipal Improvement Act of 1913.

■ It would seem, therefore, that in amending Streets and Highways Code section 10601 in 1961, the Legislature intended to activate the general validation procedure set forth in the Code of Civil Procedure only for actions to *validate* assessments, not for actions to *contest* assessments. Actions to contest assessments continue to be governed solely by section 10400, as they have been since 1913, and therefore they are not subject to the general validation procedure, and in particular they are not subject to the requirement of newspaper publication. This conclusion makes sense because actions to contest individual assessments have always been private law actions that are binding only on the parties to the action, and therefore service on and notice to other property owners by newspaper publication is not necessary. (See *Dumas v. City of Sunnyvale* (1965) 231 Cal.App.2d 796, 802 [42 Cal.Rptr. 302] [plaintiffs' assessments invalidated because they were levied without regard to the amount of special benefit conferred on the assessed properties; assessments of property owners who did not bring challenges remained unaffected]; *Reclamation District v. Bonbini* (1910) 158 Cal. 197, 205–206 [110 P. 577] [plaintiff's assessment invalidated on individual grounds; assessments of property owners who did not bring challenges remained unaffected].)[3]

Although, as we have just said, our statutory construction appears to reflect the Legislature's intent, the problem with this interpretation is the statement in section 10601 that the *validation* action authorized by that section shall not, "except when permitted by Section 10400," be brought after the date fixed for beginning work. As noted, section 10400 permits actions to *contest* an assessment, which by implication would be an action brought by some party *other than* the legislative body that levied the assessment, or the contractor, which wants the assessment validated to ensure payment. Under the express terms of section 10601, however, the legislative body and the contractor are the only parties that can bring validation actions.

Hence, we are confronted with an internal inconsistency in the statutory scheme. If we read section 10601 as authorizing a reverse validation action by a property owner aimed at contesting an assessment, then we give effect to the cross-reference in that statute to section 10400, but we contradict the express limitation of that statute to actions brought by the legislative body or the contractor. Conversely, if we hold that only the legislative body or the contractor may bring validation actions, then we render the cross-reference to section 10400 essentially meaningless, because it is hard to imagine either of

---

[3] An action contesting an individual assessment cannot *obligate* nonparties, but it might affect nonparties by *removing* an obligation. The latter would occur when the assessment is declared generally invalid as to all assessed properties within the district. (See *Harrison v. Board of Supervisors* (1975) 44 Cal.App.3d 852, 863–865 [118 Cal.Rptr. 828] [assessment invalidated in its entirety because the improvements conferred general benefits only and conferred no special benefit on *any* of the assessed properties].)

those parties wanting to prosecute an action to contest the validity of the assessment after it is levied.

    ■   In our view, the better interpretation of section 10601 is to give effect to the limiting language in that section even at the cost of rendering meaningless the section's cross-reference to section 10400. We conclude that in 1961, when the Legislature amended section 10601, it intended to incorporate the general validation procedure into the Municipal Improvement Act of 1913, without otherwise substantively changing the law, and therefore without changing the existing rule that *validation* actions could be brought only by the legislative body that had approved the assessment or the contractor that would perform the work. Because these parties would be highly unlikely to *contest* the assessment, the cross-reference to section 10400 is confusing, but we can think of at least one possible explanation for this cross-reference. Perhaps the drafters of the 1961 amendment to section 10601 were concerned that the statement requiring the validation action to be brought before the start of the work might be read broadly as applying not only to validation actions but also to actions brought under section 10400 to contest assessments. To avoid this broad interpretation, the drafters may have added the savings clause ("except when permitted by Section 10400") without being aware of the internal inconsistency that the clause effected.

    In summary, an action under section 10400 to contest an assessment can merely *invalidate* that assessment, either generally or as to one or more individual properties—it cannot impose an obligation on nonparties to *pay* an assessment—and therefore service on and notice to other property owners by newspaper publication is unnecessary. Accordingly, there was no reason for the Legislature to apply the protections of the general validation procedure to actions under section 10400. It is true that the success of such an action would reduce (and might eliminate) the funds available to finance the planned improvements, and therefore it would indirectly affect other assessed properties (either by reducing the scope of the project or by necessitating a new assessment or some alternative source of funding), but there are countless situations in the law in which third parties will be negatively affected by the success of a pending lawsuit, and the law does not require formal notice to those third parties. If notice to nonparties is appropriate in the context of a property owner's action contesting an assessment under the Municipal Improvement Act of 1913, then it is for the Legislature to require such notice. It has not done so in section 10400, and by its terms, section 10601 does not apply to actions brought by property owners to contest assessments.

## IV

■ We conclude that the general validation procedure set forth in Code of Civil Procedure sections 860 through 870.5 does not apply here, where property owners are contesting individual assessments levied under the Municipal Improvement Act of 1913. Because the Court of Appeal reached the opposite conclusion, we reverse its judgment and remand the case to that court with instructions to reverse the judgment of the trial court.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.