Filed 5/17/13  Grantville Action Group v. City of San Diego CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GRANTVILLE ACTION GROUP,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SAN DIEGO et al.,<br><br>Defendants and Respondents. | D059318<br><br><br><br>(Super. Ct. No. 37-2008-00092628-<br>CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan M. Lewis, Judge.  Affirmed.

Law Office of Craig A. Sherman and Craig A. Sherman for Plaintiff and Appellant.

Kane Ballmer & Berkman, Murray O. Kane, Donald P. Johnson; Thomas E. Montgomery, County Counsel, and William A. Johnson, Deputy County Counsel, for Defendants and Appellants.

In May 2005 the City of San Diego (the City) and its redevelopment agency (the Agency) adopted the Grantville Redevelopment Project (GRP) finding that the area within the GRP was blighted and required action by the Agency to remedy that blight.

In this action, plaintiff Grantville Action Group (GAG) sought to challenge, under the Community Redevelopment Law (CRL), Health & Safety Code (all undesignated statutory reference are to the Health & Safety Code) section 33000 et seq., decisions made by the defendants City, the Agency, and the County of San Diego (the County) (collectively referred to as defendants) arising from a settlement of the County's lawsuit challenging the GRP. Specifically, GAG asserts that the County's lawsuit, and the subsequent settlement agreement, improperly guaranteed the County would recapture 100 percent of its projected $49 million in lost tax revenue from adoption of the GRP. GAG asserts that this "revenue shifting scheme" is "exactly the type of action the Legislature sought to prohibit in enacting the [CRL]." Further, GAG asserts that these actions violated the legal doctrine that you "cannot do indirectly what the law (and Legislature) prohibits [you] from doing directly."

Following a court trial, the court issued a decision in the City, County and Agency's favor, finding the CRL does not "prohibit[] the transfer of monies in this manner."

On appeal, GAG asserts the court erred in its ruling because (1) the settlement of the County's lawsuit violated the CRL, which established a pass-through formula, offset requirements for such projects, and other requirements for redevelopment plans; (2) when approving the transfer and use of a redevelopment tax increment for public facilities, it

2

was inappropriate to reference an entire redevelopment plan, with no identified project; and (3) the County's agreement to transfer and use the GLP's tax increment for construction/improvement of its County Administration Center (CAC) was in violation of the restrictions set forth in the CRL. We affirm.

## FACTUAL BACKGROUND

### A. *The GRP*

In May 2005 the City and the Agency adopted the GRP. In the GRP, the City and Agency found that the area within the boundaries of the GRP was blighted and required action by the Agency to remedy that blight. The objectives of the GRP included the following: (1) eliminate and prevent the spread of blight and deterioration of the area; (2) improve traffic flow through the development of a circulation network to the Mission Gorge corridor and Grantville industrial area; (3) improve public infrastructure, including storm drains to Alvarado Creek and the San Diego River, widening existing roadways and sidewalks or creating new ones, and undergrounding utilities; (4) alleviate the shortage of commercial and industrial parking; (5) streetscape enhancements and revitalization of incompatible uses and obsolete buildings; (6) revitalize the commercial corridor along Mission Gorge Road; (7) expand and add community park and recreational facilities, including along the San Diego River.

The Agency also adopted a five-year implementation plan (Five-Year Plan), which provides a general outline of the actions the Agency may take in eliminating blight in the Grantville area. The actions proposed during the first year of the Five-Year Plan involve actions relating to the objectives described, *ante*, including, among other items: (1)

3

planning for Mission Gorge Road traffic improvements, including the Interstate 8 interchange at Alvarado Canyon Road; (2) pedestrian circulation improvements along Alvarado Creek, focused on the Grantville Trolley Station; (3) identifying storm drain improvements; (4) developing opportunities of the San Diego River Master Plan once it is finalized; and (5) monitoring, coordinating and expanding activities with other public agencies, including business outreach and marketing, housing programs, streetscape, lighting and landscape improvements.

B. *The County's Lawsuit*

The County filed an action challenging the adoption of the GRP. The County's complaint alleged, among other claims, that there was insufficient evidence of physical and economic blight in the Grantville area.

Atomic Investments, Inc. (AII) also filed a case challenging the GRP. AII challenged the inclusion of two of its properties (the Discount Tire property and the Veteran's Administration property) in the GRP.

The County and the AII cases were subsequently consolidated (the County Case). GAG did not participate in the County Case. Thereafter, the County Case settled.

C. *Hearings on GRP*

On July 29, 2008, the San Diego City Council (City Council) and the Agency's board (the Board) held a joint public hearing on the subject agreements. Proponents and opponents of the proposed settlement and the related agreements were heard. The opponents, including GAG's representative, Brian Peterson, criticized the Agency's

4

finding of blight in the Grantville area and the Agency's possible use of eminent domain relating to the GRP.

At the conclusion of the public hearing, the City Council and Agency's board adopted resolutions approving four cooperation agreements by a vote of seven to one and made findings required by section 33445. The Agency's board also adopted a resolution to settle AII's claims in the County Case by a vote of eight to zero.

Similarly, on September 23, 2008, the County Board of Supervisors held a public hearing and adopted resolutions relating to two cooperation agreements and made findings required by section 33445

Counsel for the opponents of the settlement submitted a letter to the County and made a presentation in opposition to the settlement and its related agreements. GAG also submitted a letter and made a presentation in opposition to the settlement.

The settlement agreement, which included four cooperation agreements, was approved by all parties on August 29, 2008. The four cooperation agreements and resolution that effectuated the settlement consist of the following:

1. The transit line improvement cooperation agreement, which provided that the Agency would transfer $31.36 million to the City for the construction of improvements to the C Street trolley line downtown as part of the Centre City Redevelopment Project. Those improvements were required to permit a direct transit line for trolley line riders between Grantville and downtown, thereby increasing Grantville public transit use and alleviating existing transit congestion in Grantville.

2. The North Embarcadero improvements and facilities cooperation agreement (North Embarcadero agreement) provided for the Agency's payment of $31.36 million in Centre City Development Corporation (CCDC) funds to the County for use in constructing improvements relating to the County Waterfront Park Plan along the harbor-front area of downtown, so long as they are consistent with CRL.

3. The joint projects cooperation agreement provided for the payment by the Agency of $7.84 million for the development of projects recommended by the County that benefit the Grantville Redevelopment Project area consistent with the CRL.

4. The affordable housing credit and allocation agreement, which provided that the County would receive $9.8 million in affordable housing credits towards its share of the regional housing needs allocation.

5. The AII resolution, which provided that certain properties owned by AII would not be subject to eminent domain.

On September 8, 2008, pursuant to the settlement agreement, the court issued a judgment on validated actions. That judgment validated the GRP and found that the GRP was legal and valid in all respects. No party to the validation action filed an appeal.

D. *The Instant Action*

On September 26, 2008, GAG filed a complaint and petition for writ of mandate seeking to invalidate the resolutions, actions and findings made by the City, the Agency,

6

and the County, related to the GRP.[1] In its complaint and petition, GAG challenged three of the four cooperation agreements - the transit line improvements agreement, the joint projects agreement, and the North Embarcadero agreement GAG also challenged the resolution that settled AII's claims, but that claim was subsequently dismissed by the court.

The trial in this matter was heard on November 16, 2010. At the conclusion of trial, the court took the matter under submission.

On December 20, 2010, the trial court issued its tentative statement of decision. In that tentative statement of decision, the trial court made several findings. As to GAG's argument that the defendants "cannot do indirectly what [they] cannot legally do directly," the court found: "Although there is some appeal to this argument, the Court does not believe the law prohibits the transfer of monies in this manner. The Court agrees with the thoughts expressed by the Attorney General's office that 'although it might be questioned whether this arrangement carries out the Legislatures' [*sic*] intent in adopting the anti-pass through provision in 1993, it appears to be technically permissible.' [Citation.] [¶] For the foregoing reasons—and for the reasons discussed below—this Court concludes that the appropriate findings under [section] 33445 were made and that the settlement and related transactions did not violate pass-through restrictions. The motion for judgment on this issue is therefore denied."

---

[1]    A complaint filed by an interested person to invalidate a public agency matter is commonly referred to as a "reverse validation" action. (*Bonander v. Town of Tiburon* (2009) 46 Cal.4th 646, 656.)

7

Footnote 5 in the court's tentative decision states: "In this regard, the Court finds *Graber v. City of Upland* (2002) 99 Cal.App.4th 424 to be distinguishable. There, the improper purpose of the ordinance was conceded by the City as the Court of Appeal acknowledged ['Although the issue is a close one, the city's candid statement of its reasons for adopting ordinance No. 1683 makes it clear to us that the sole purpose of the ordinance was to avoid the base year limitation for the 77-acre parcel. We agree with the trial court that this is an improper purpose which conflicts with the statutory scheme.'] In this case there is no acknowledged improper purpose."

As to GAG's argument that the agreements should be reviewed as a single transaction in determining if they were lawful, rather than reviewing each individual agreement, the trial court found that GAG challenged only certain portions of the overall settlement, and that, "Similar to how [GAG] approached the case—and as Defendants argue—the Court believes it may look at each agreement separately to see if any of Plaintiff's other arguments have merit."

As to the transit line agreement, the trial court found that the agreement "was adequately provided for in the Grantville Redevelopment Plan" and "[t]he appropriate findings" were made pursuant to section 33445, and therefore GAG's motion as to that agreement was denied

As to the joint projects agreement, the court found, "Although the 'Joint Projects' are not identified with specificity, the Joint Projects Agreement provides that the projects be consistent with the CRL [citation], which requires a five year implementation plan. [Citation.] The Grantville Five-Year Implementation Plan lists specific projects that may

8

be funded. [Citations.] Moreover, the funding of a joint project must follow a process requiring Agency approval based upon whether the proposed project benefits the Grantville Redevelopment Project area consistent with the CRL. [Citation.] The Court concludes that the Joint Projects are sufficiently identified for purposes of compliance with the CRL." The court also found that this challenge to the joint projects agreement had not been administratively exhausted as to the City and Agency.

As to the North Embarcadero agreement, the court found that the issue relating to the alleged possible use of the North Embarcadero funds to improve the County Administrative Center in purported violation of section 33445, subdivision (g)(1) (section 33445(g)(1)) had not been administratively exhausted, and therefore denied judgment as to that issue.

On February 15, 2011, the court entered judgment in defendants' favor, finding that all of the subject actions taken by the City, Agency, and County were "adequate, sufficient, legal, and valid and in conformity with the applicable provisions of laws and enactments, including the applicable provisions of the Community Redevelopment Law . . . ."

After plaintiffs filed this appeal from the judgment of dismissal, the CRL was amended to dissolve all redevelopment agencies in California. (§ 34172.) The Agency was dissolved effective June 29, 2011, and the City of San Diego Redevelopment Successor Agency (Successor Agency) was designated as its successor agency as provided for in the amended provisions of the CRL. (§§ 34171, subd. (j), 34173, subds. (b) & (d)(1), 34176, subd. (a).) The Successor Agency now stands in the place of the

9

Agency in this litigation. (§ 34173, subd. (b) ["all authority, rights, powers, duties and obligations previously vested with the former redevelopment agencies . . . are hereby vested in the successor agencies."].)

## DISCUSSION

On this appeal, GAG does not challenge the affordable housing credit and allocation agreement or the AII resolution. Therefore, only three of the cooperation agreements are before us on this appeal: the transit line improvements agreement, the joint projects agreement and the North Embarcadero agreement.

## I. *STANDARD OF REVIEW*

Because this appeal involves issues of law, we apply the de novo standard of review. (*Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74; *Community Youth Athletic Center v. City of National City* (2009) 170 Cal.App.4th 416, 427.)

## II. *ANALYSIS*

### A. *Section 33445 Permits the Subject Agreements*

Redevelopment agencies are funded by a portion of property taxes generated within a redevelopment project area, which is commonly referred to as "tax increment" financing. (Section 33670, subd. (b)); *City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 866.)

Section 33445, subdivision (a) (section 33445(a)) authorizes the transfer of tax increment from a redevelopment project for the construction of public facilities. At the time the subject agreements were approved, former section 33445(a) permitted the

10

transfer of tax increment for a public facility within or without the redevelopment project area if the appropriate legislative body made the following findings: (1) "That the buildings, facilities, structures, or other improvements are of benefit to the project area or the immediate neighborhood in which the project is located, regardless of whether the improvement is within another project area;" (2) there are "no other reasonable means of financing" the public improvements; and (3) the payment of the funds for the public improvements will assist in eliminating one or more blighting conditions within the project area and is "consistent with" the redevelopment project implementation plan.

The findings required by section 33445(a), if they are made as specified in that section, are final, conclusive, and not subject to court review. (§ 33445, subd. (b) (section 33445(b)).)

As we have discussed, *ante*, defendants made these findings in satisfaction of the requirements of section 33445(a). Furthermore, those findings procedurally complied with the requirements of the CRL governing the adoption of the related resolutions. (*Meaney v. Sacramento Housing & Redevelopment Agency* (1993) 13 Cal.App.4th 566, 580-581 (*Meaney*).)

Moreover, Courts of Appeal have consistently approved the use of tax increments for public improvements under section 33445. In *Meaney, supra,* 13 Cal.App.4th 566, the county entered into an agreement with the city and agency by which the City of Sacramento and its redevelopment agency agreed to pay the county the amount of property tax it would have otherwise received and provided that such payment would be made toward a new county courthouse and "other related County public facilities." (*Id.* at

11

p. 573.)  The court rejected the plaintiff's argument that use of tax increment to construct the courthouse was illegal, stating, "It will be noted that the first paragraph [of section 33445] generally authorizes an agency to pay for the construction cost and land value of publicly owned facilities which benefit the [redevelopment] project area. . . .  The agency's authority to make the payments implies, we conclude, authority to enter into agreements governing the conditions of payment, including agreements with the local government which will own the public facility."  (*Meaney*, at p. 575.)

In this case, defendants found that (1) the North Embarcadero improvements would benefit the Centre City Redevelopment Project or the immediate neighborhood in which the improvements were located; and (2) the use of $7.84 million of tax increment for joint projects consistent with the CRL would benefit the GRP or the immediate neighborhood in which they are located.  Thus, under section 33445 and *Meaney*, these are lawful expenditures of the Grantville tax increment.

Similarly, in *City of Cerritos v. Cerritos Taxpayers Assn.* (2010) 183 Cal.App.4th 1417 (*Cerritos*), the Court of Appeal addressed a transaction in which the redevelopment agency agreed to lease school district-owned property to a nonprofit housing corporation whose board of directors was the city council.  The agency would then finance the development of a low-cost housing project.  As part of that same transaction, the city agreed to purchase certain real property and improve that property for the relocation of the school district offices.  (*Id.* at pp. 1425-1427.)  The Court of Appeal affirmed the trial court judgment validating the transaction, holding that the subject transaction was prmitted by section 33445(a).  (*Cerritos*, at pp. 1430-1431.)

12

Moreover, as both the *Meaney* and *Cerritos* courts noted, the required legislative findings are *final* and *conclusive* and beyond judicial review under section 33445(b). (*Meaney, supra,* 13 Cal.App.4th at p. 578 ["the evidentiary basis for the findings are supported by substantial evidence or by any evidence at all in the administrative record"]; *Cerritos, supra,* 183 Cal.App.4th at pp. 1434-1435 ["The City and Agency made all the findings required by [section 33445(a)] . . . . Nothing further is required by section 33445. And, as subdivision (b) of that section states, 'The determinations . . . shall be final and conclusive.'"] The only permissible judicial review is whether the appropriate procedures were followed and whether the determinations that were made comply with section 33445. (*Meaney, supra,* 13 Cal.App.4th at pp. 578-579.)

In this case, defendants utilized the procedures prescribed by section 33445(a). They approved the expenditure of GRP funds for the construction of public improvements located outside the Grantville Project area. In approving those expenditures, defendants made the statutory findings that the subject expenditures will benefit the GRP or the immediate neighborhood in which the project is located, that there is no other reasonable means of financing the public improvements, and that the expenditures for the public improvements will assist in the elimination of one or more blighting conditions and are consistent with an adopted implementation plan.

Those findings are now beyond judicial scrutiny because defendants proceeded as required by law. (§ 33445(b).)

Finally, it should be noted that the Attorney General's Office reviewed the subject transactions and opined in a letter to Senator Christine Kehoe that the subject transactions

13

are "permissible" under the CRL.  An opinion by the Attorney General's Office, while not binding, "'[is] entitled to great respect' and given great weight by the courts."  *(Shapiro v. Board of Directors* (2005) 134 Cal.App.4th 170, 183, fn. 17.)

B.  *Legislators' Motivation*

As noted, *ante,* GAG asserts that the City, Agency, and County were impermissibly motivated to "do indirectly what [they] cannot legally do directly."  We reject this contention because courts do not review the motivations of local legislators in the actions they undertake.  Courts only review the legality of *the actions themselves*.

In *County of Los Angeles v. Superior Court* (1975) 13 Cal.3d 721, the plaintiff filed a taxpayer suit challenging the County's adoption of an ordinance on the basis that it had been adopted as a result of a threatened illegal strike by public employees.  The trial court granted a motion to permit certain discovery relating to the supervisors' motivation in enacting the ordinance.  The California Supreme Court issued a writ of prohibition as to that discovery, holding it was barred by the rule precluding courts from inquiring into legislators' motivation.  As our high court explained, "[T]he discovery order in the instant case implicates a . . . fundamental, historically enshrined legal principle that precludes any judicially authorized inquiry into the subjective motives or mental processes of legislators.  As early as 1855, Chief Justice Murray declared in an opinion for this court: 'I know of no authority this Court possesses to inquire into the motives of the Legislature in the passage of any law; on the contrary, it has been uniformly held, that they could not be inquired into.'  [Citation.]  This doctrine has been reiterated in literally scores of California decisions."  *(Id.* at p. 726.)  "'The diverse character of such motives, and the

14

impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile.'" (*Ibid*.)

Similarly, in *Board of Supervisors v. Superior Court* (1995) 32 Cal.App.4th 1616 the court stated, "'[T]here is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters. If the law is struck down for this reason, rather than because of its facial content or effect, it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons.'" (*Id.* at p. 1624, fn. 3.)

Also, the United States Supreme Court in *Soon Hing v. Crowley* (1885) 113 U.S. 703, 710-711, made the following statement: "[T]he rule is general with reference to the enactments of all legislative bodies that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferrible from their operation, considered with reference to the [conditions] of the country and existing legislation."

In *Rider v. City of San Diego* (1998) 18 Cal.4th 1035 (*Rider II*), the California Supreme Court reviewed a transaction by which the City of San Diego and the San Diego Port Authority formed a joint authority to issue bonds for expansion of the City's convention center. The plaintiff there asserted that the City and Port Authority's motivation in doing so was to avoid the two-thirds vote requirement that would have applied if the City had issued the bonds. Our high court rejected that argument, stating, "We are not naive about the character of this transaction. If the City had issued bonds to pay for the Covention Center expansion, the two-thirds vote requirement would have

15

applied.  Here, the City and the Port District have created a financing mechanism that matches as closely as possible (in practical effect, if not in form) a City-financed project, but avoids the two-thirds vote requirement.  Nevertheless, the law permits what the City and Port District have done."  (*Id.* at p. 1055.)

Acknowledging the holding in *Rider v. County of San Diego* (1991) 1 Cal.4th 1 (*Rider I*) that local governments could not circumvent Proposition 13's requirement of a two-thirds vote to impose "special taxes" by creating a financing agency, our high court nevertheless held that the actions of the City in *Rider II* were proper:  "The short answer to plaintiffs' argument is that the Constitution and the City's charter permit the City to avoid the two-thirds vote requirement by creating a joint powers agency to finance public works projects.  Therefore, however we might characterize the financing plan at issue here, we cannot characterize it as unlawful."  (*Rider II, supra,* 18 Cal.4th at p. 1042.)

Accordingly, GAG's attempt to challenge the agreements based on defendants' purported motivation is unavailing.  Courts may not inquire into the motivations of a local legislative body, such as the City Council, Agency and County Board of Supervisors, to determine if they intended to "do indirectly what they could not do directly."

GAG asserts that *Graber v. City of Upland, supra,* 99 Cal.App.4th 424, controls in this case.  However, the Court of Appeal in *Graber* was only able to consider the local legislators' intent only because that intent was *admitted* by the city and *expressly stated in the ordinance that was under review by the court*:  "[T]he city's candid statement of its reasons for adopting ordinance No. 1683 makes it clear to us that the sole purpose of the

16

ordinance was to void the base year limitations for the 77-acre parcel. We agree with the trial court that this is an improper purpose which conflicts with the statutory scheme." (*Id.* at p. 433).

In this case, however, defendants have made no such admissions relating to the subject agreements. Rather, it has been defendants' position throughout these proceedings that the subject agreements were lawful under the CRL.

GAG's citation to *St. John's Well Child & Family Center v. Schwarzenegger* (2010) 50 Cal.4th 960 is also unavailing. That case concerned the Governor's line item veto power, not the motivation of legislators in enacting laws. (*Id.* at p. 979, fn. 13.)

C. *The Subject Agreements Do Not Violate Section 33607.5*

GAG asserts that the settlement violates section 33607.5 because the settlement amounts to a prohibited "pass-through" of tax increment to the County. Procedurally, that argument is barred by the doctrine of failure to exhaust administrative remedies. Substantively, the argument fails as the agreements are not subject to the limitations of section 33607.5. Finally, this contention misapprehends the payments under the subject agreements. They are not payment of additional general fund moneys "passing through" to the County. Rather, they are permissible transfers of tax increment for projects consistent with the purpose of redevelopment.

1. *Failure to exhaust administrative remedies*

GAG never raised any issue relating to a potential violation of section 33607.5 in its opposition at the City/Agency hearing or at the County hearing. Therefore, that issue is barred by the doctrine of failure to exhaust administrative remedies. (*Evans v. City of*

17

*San Jose* (2005) 128 Cal.App.4th 1123, 1136-1137 [In a validation action challenging a redevelopment plan adoption, the challenger must raise all issues at the administrative level.].)

2. *The agreements are not subject to section 33607.5*

Section 33607.5, subdivision (f)(2) (section 33607.5(f)(2)) provides: "Notwithstanding any other provision of law, a redevelopment agency shall not be required, either directly or indirectly, as a measure to mitigate a significant environmental effect or as part of any settlement agreement or judgment brought in any action to contest the validity of a redevelopment plan pursuant to Section 33501, to make any other payments to affected taxing entities, *or to pay for public facilities that will be owned or leased to an affected taxing entity*."

However, the legislative history of section 33607.5, states that it "[p]rohibits an agency from paying for any public improvement *unless the legislative body makes the determination that the proposed improvement will assist in the elimination of blight*." (Assem. Com. on Housing and Community Develoment, Rep. on Assem. Bill No. 1290 (1993-1994 Reg. Sess.) June 16, 1993, p. 4, italics added.) Defendants made such a finding as to each cooperation agreement and therefore section 33607.5 does not apply.

Additionally, appellant's argument as to the joint projects agreement also fails under the express language of section 33607.5(f)(2). This is so because (1) the Agency is not being compelled to make the subject payments, they are voluntary payments under the terms of the subject cooperation agreements; (2) there is no payment to the County as the payment is to a joint account; and (3) there is no evidence that a joint project will be

18

owned by the County because the agreement requires the joint project to be consistent with the CRL, under which such ownership would be precluded.

Recognizing that the express provisions of section 33607.5(f)(2) do not support its position, GAG argues that the *intent* of the CRL should override the specific statutory provisions. However, """If the [statutory] language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature.""" (*People v. Zambia* (2011) 51 Cal.4th 965, 972.)

Further, the intent of the CRL as to additional payments to local taxing entities does not assist appellant in this case. The intent of the CRL was to eliminate pass-through agreements and replace them with the statutory pass-through payments.

Under sections 33607.5 and 33607.7, agencies must pay a portion of their tax increment to "affected taxing entities." These payments are referred to as "pass-through" payments. (*Los Angeles Unified School Dist. v. County of Los Angeles* (2010) 181 Cal.App.4th 414, 421-422 [discussing the general nature of pass-through payments].)

However, in this case, the Agency (now the Successor Agency) is not paying any additional money into the County's general fund pursuant to the subject agreements. Any money transferred pursuant to the subject agreements is strictly for projects consistent with the CRL. For example, the joint projects agreement repeatedly provides that any expenditure under the agreement must benefit the GRP consistent with the CRL. Similarly, the Agency found that the North Embarcadero improvements will benefit the Centre City Redevelopment Project. (1AR ex. 8:69, ¶ 1.a)!

19

Therefore, because any tax increment transferred under the joint projects agreements is limited to benefiting redevelopment consistent with the CRL and is not paid into the County's general fund for any expenditure that the County may choose to make, the funds transferred under the subject agreements do not constitute impermissible additional payments under section 33607.

Finally, GAG argues that public policy should support its position. However, questions relating to public policy are to be addressed by the Legislature, not the courts. (*Los Angeles Unified School Dist. v. County of Los Angeles, supra,* 181 Cal.App.4th at p. 427 "[I]t is not our province 'to second-guess the wisdom of legislative appropriations. The forums for addressing this issue lie with the voters and the Legislature.'"].)

D. *Failure To Identify Specific Projects*

GAG contends that the joint projects agreement violates the CRL because it does not specifically identify the joint projects that are the subject of the agreement. That argument is unavailing for two reasons. First, this issue has been waived because neither GAG nor any other entity or person raised that issue in the administrative hearings conducted by the City and Agency. Second, this contention is not supported by law. Under the CRL, joint public projects may be "consistent with" the redevelopment plan without being specifically identified.

1. *Waiver*

No objection was made at the joint public hearing of the City Council and Agency board that the joint projects agreement was unlawful because it failed to identify the specific development projects that were going to be constructed. As we have noted, *ante*,

20

a challenger in a validation case "must also show that the issues raised in the judicial proceeding were raised at the administrative level. . . . [¶] 'The rule affords the public agency an "opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review."'" (*Evans v. City of San Jose, supra,* 128 Cal.App.4th at pp. 1136-1137.)

GAG asserts that even if it did not exhaust this issue as to the City and Agency, it did exhaust the issue as to the County. That contention is unavailing because GAG (or another individual or entity) was obligated to raise and preserve the issue at *all* stages of the administrative proceedings. (*City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 609 ["Exhaustion requires 'a full presentation to the administrative agency upon all issues of the case and at all prescribed stages of the administrative proceedings.'"].) Because the joint projects agreement was required to be approved by the City/Agency *and* the County, GAG was required to raise this issue before each approving body.

2. *Failure To Identify Specific Projects*

As we have noted, *ante*, GAG also asserts that the subject agreements violate the CRL because they fail to identify any specific projects. We reject this contention.

GAG's argument misapprehends the purpose of a redevelopment plan. A redevelopment plan is not a blueprint for the construction of specific identified projects on specific identified parcels of land in the project area. As the California Supreme Court stated in *In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 52: "It appears that a final [redevelopment] plan under the Community Redevelopment Law does not

21

require an architectural plan complete with engineers' specifications; it contemplates, rather, a comprehensive method or scheme of action, a way proposed to carry out within the essential framework of the law a particular project of redevelopment."

In *County of Santa Cruz v. City of Watsonville* (1985) 177 Cal.App.3d 831, 841 the Court of Appeal stated: "Thus, a redevelopment agency is unique among public entities since in order to achieve its objective of eliminating blight it must rely upon cooperation with the private sector. Redevelopment is also a process which occurs over a period of years. These realities dictate that a redevelopment plan be written in terms that enhance a redevelopment agency's ability to respond to market conditions, development opportunities and the desires and abilities of owners and tenants. *Such a plan then cannot always outline in detail each project that a redevelopment agency will undertake during the life of the plan.* [Citations.] [¶] . . . . 'It cannot be seriously argued that a final plan must be a compilation of blueprints or working drawings, representing final engineering studies, primarily because the agency is not the one who does the building. The final plan is not required to be precise from an engineering standpoint but only as reasonably precise and detailed from a planning standpoint as may be expected in light of 'the complexity and diversity of the conditions which will be encountered.'"

A redevelopment plan is just that: a general *plan* for the redevelopment of different types of identified projects. Here, the GRP provides for a wide variety of public projects (in addition to private projects) designed to eliminate blight in the Grantville Project area, as we have detailed, *ante.*

22

Therefore, GAG's contention that the joint projects agreement lacks any identified projects is unavailing. As the court correctly found, the public projects that are the subject of the joint projects agreement are adequately identified in the GRP and the related Five-Year Plan.

GAG asserts that defendants improperly found that the joint project may benefit a neighborhood that is outside the neighborhood in which the joint project is located, rather than solely the Grantville Project area. We reject this contention.

First, the joint projects agreement requires that any proposed joint project benefit the Grantville Project area. The Agency (now the Successor Agency) is obligated to determine if the project proposed by the County "benefits the Grantville Redevelopment Project Area."

Further, defendants' findings were in accord with the provisions of former section 33445, subdivision (a)(1) (section 33445(a)(1)) as it existed at the time of the findings in 2008, which provided: "(a) Notwithstanding Section 33440, an agency may, with the consent of the legislative body, pay all or a part of the value of the land for and the cost of the installation and construction of any building, facility, structure, or other improvement that is publicly owned either *within or without the project area*, if the legislative body determines all of the following: [¶] (1) That the buildings, facilities, structures, or other improvements are of benefit to the project area or the immediate neighborhood in which the project is located, *regardless of whether the improvement is within another project area*, or in the case of a project area in which substantially all of

23

the land is publicly owned that the improvement is of benefit to an adjacent project area of the agency."  (Italics added.)

Therefore, because defendants made the appropriate findings under section 33445(a)(1) as it is applicable to the joint projects agreement, GAG's challenge to that finding lacks merit because those findings are final and conclusive.  (§ 33445(b).)

E. *Alleged Use of Tax Increment for County Administration Center*

GAG asserts that the use of tax increment for improvements to the CAC violates the CRL.  GAG's argument is unavailing.  First, the North Embarcadero agreement does *not* provide for, or allow, funds to be used for the CAC building.  Second, GAG failed to raise this issue in the administrative proceedings, and therefore, as the trial judge correctly concluded, the argument is waived.

1. *The North Embarcadero agreement funds were not intended for use on the CAC building*

The North Embarcadero agreement does not authorize funds to be used to construct/improve a county administration building.  Pursuant to the North Embarcadero agreement, the Agency (now the Successor Agency) will provide a total of $31.36 million in 39 annual payments to pay for the North Embarcadero Project Improvements.

The North Embarcadero Project Improvements are described in exhibit B to the agreement which provides, "'North Embarcadero Project Improvements' shall include projects consistent with the County 'Waterfront Park' Plan and the California Community Redevelopment Law, as they may be amended from time to time."

24

Thus, the provisions of the North Embarcadero agreement require compliance with the CRL and only include projects related to the proposed Waterfront Park Plan, not the CAC building itself.

For example, the Waterfront Park Plan provides for a waterfront park on land adjacent to and in the vicinity of the CAC building. The Waterfront Park Plan's purpose is to "transform this land into an unparalleled waterfront park . . . ." The term "land" refers to the surface parking lots on either side of the County building, not the building itself.

Section 33445(g) does not prohibit the use of tax increment to improve a public park on County-owned land. It only prohibits using tax increment funds towards either a new County administration building or rehabilitation of an existing County administration building. Former Section 33445, subdivision (g)(1) (now section 33445, subd. (e)(1)) provides: "Notwithstanding any other authority granted in this Section, an agency shall not pay for, either directly or indirectly, with tax increment funds the *construction, including land acquisition, related site clearance, and design costs, or rehabilitation of a building that is, or that will be used as, a city hall or county administration building*." (Italics added.)

The improvements and facilities which are the subject of the North Embarcadero agreement, as set forth in exhibit B, do *not* include any description that would expressly or impliedly allow the funds to be used for the CAC building. Because the CRL specifically prohibits the expenditure of Agency funds for the "construction or expansion of a county administrative office," the North Embarcadero agreement does not permit the

25

alleged illegal expenditure argued by GAG. Indeed, if the County expenditures under the North Embarcadero agreement are inconsistent with the agreement, i.e., violate the CRL, the Agency Director is authorized to withhold the funds.

GAG's argument is based on selected references to a planning document for the Waterfront Park Plan that describes possible enhancements to the CAC building itself. However, none of those building projects are included in the list of projects in exhibit B to the North Embarcadero agreement because such use would be inconsistent with CRL and contrary to the intent of the North Embarcadero agreement.

GAG thus ignores the relevant evidence and the North Embarcadero agreement in asserting that it allows funding for the CAC building itself. By the explicit terms of the North Embarcadero agreement, the funds may only be used to fund projects consistent with the Waterfront Park Plan and the CRL. Using the transferred funds for a County administration building would violate the CRL and thus it is prohibited by the terms of the North Embarcadero agreement itself. Accordingly, GAG's argument that the North Embarcadero agreement violates the CRL and section 33445 is unavailing.

2. *GAG failed to raise this issue at any public hearing*

As the trial court found, neither GAG nor any other entity or person raised this issue in the administrative proceedings, therefore, the issue has been waived. However, GAG asserts that exhausting administrative remedies as to this issue would have been futile. We reject this contention.

"The doctrine requiring exhaustion of administrative remedies is subject to exceptions. [Citation.] Under one of these exceptions, '[f]ailure to exhaust

26

administrative remedies is excused if it is clear that exhaustion would be futile.' [Citations.]  'The futility exception requires that the party invoking the exception "can positively state that the [agency] has declared what its ruling will be on a particular case."'"  (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1080-1081.)

Here, GAG never raised this issue before the City and Agency and, as discussed, *ante*, exhaustion is required before all approving public entities.  Further, there is nothing in the administrative record that suggests that the public hearing was a sham or the result a foregone conclusion.  Rather, the public was allowed to speak freely about the proposed agreements, and the members of the Board of Supervisors debated the agreements and approved them by a split vote.

Had GAG raised the issue at the County's public hearing, the record could have been clarified to make clear that the North Embarcadero agreement does not permit the use funds for construction, land acquisition, site clearance, design costs, or rehabilitation of the CAC because the use of the funds must be consistent with the CRL

Accordingly, GAG's "futility" exception argument lacks merit.

DISPOSITION

The judgment is affirmed.  Defendants shall recover their costs on appeal.


NARES, Acting P. J.

WE CONCUR:


McINTYRE, J.


IRION, J.

28